The People of the State of Illinois, *ex rel.*
John M. Wilson *et al.*, South Park Commissioners,

*v.*

Edward S. Salomon, County Clerk of Cook County.

1. Municipal corporations—*of the power of the legislature to create special taxation districts for municipal purposes.* While section 5 of article 9 of the constitution, which provides that the corporate authorities of counties, townships, school districts, cities, towns and villages, may be vested with power to assess and collect taxes for corporate purposes, must be construed as a limitation upon the power of the legislature to authorize any other than corporate authorities to assess and collect local taxes, and as limiting the objects of local taxation to corporate purposes, yet it does not confine the legislature to any particular corporate authorities, or to any then known instrumentalities of that character. There is no prohibition against

the creation by the legislature, of every conceivable description of corporate authority, and, when created, to endow them with all the faculties and attributes of other pre-existing corporate authorities.

2. So, several towns may be united in one district for the special purpose of establishing and maintaining, a public park, and the corporate authority of the district so created, in respect to the special object of its creation, may be vested in commissioners specially created for the purpose, and in whom the power may be vested, of assessing and collecting taxes, for the special corporate purpose, within the new corporate district.

3. But this power in the legislature is subject to this limitation, that, a local burthen of that character cannot be imposed upon the people of the district so created, without their consent; and it seems the assent of a majority of each of the towns to be affected, would be essential.

4. Same—*what constitutes a municipal corporation—and herein, of the act* 1869, *in relation to the South Park, in Chicago.* So, under the act of February 24, 1869, providing for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, those towns were erected into a park district, and the people of the towns affected by the act having, by a vote, accepted its provisions, the board of park commissioners thereby created, to whom was committed the entire control of the park, became a municipal corporation, in whom it was competent for the legislature to vest the power to assess and collect taxes within the park district so created, for the special corporate purpose of its creation, and such is the effect of that portion of the act which requires the county clerk of the county in which that district is situated, on the estimate of the park commissioners, to place the amount required, within certain limits, in the tax warrants for the towns embraced in the district.

5. Taxation—*of the property of municipal corporations.* That clause in the constitution which requires that every person *and corporation* shall pay a tax in proportion to the value of his or her property, does not embrace public municipal corporations. The corporations aimed at by the constitution, are private, nòt public, corporations.

6. So, it was competent for the legislature, in providing for the establishment and maintenance of the South Park, in the city of Chicago, and creating a board of commissioners, in whom the fee of the park property was vested, but the *usufruct* in which was in the public, to exempt such property from taxation.

7. Statutes—*of submitting acts of the legislature to a vote of the people.* The power to enact laws necessarily includes the right ·in the law-making power to determine and prescribe the conditions upon which the law in a given case, shall come into operation or be defeated, and this contingency may as well be the result of the vote of the people of the locality to be affected by the law as any other.

8. MANDAMUS—*whether it will be awarded pending another proceeding involving the same question.* It has been held, that where the parties have commenced proceedings other than by mandamus, to obtain the adjudication of a question, the court will not, except in extraordinary cases, interfere by mandamus. But as the granting of a mandamus is a matter of discretion, the pendency of another proceeding will not prevent its being awarded, if it seems to the court to be proper to do so.

9. So, upon an application of the commissioners of the South Park, in Chicago, for a mandamus to compel the county clerk of Cook county to receive and file an estimate made by the commissioners, of the amount of money required for park purposes, and to place that amount in the proper tax warrants to be collected from the tax payers of the district, as provided in an act of the legislature on that subject, it was held, the writ of mandamus ought to be awarded, notwithstanding the pendency of a suit in chancery, by which the county clerk and the commissioners, were sought to be enjoined, at the instance of a property owner interested, from doing the same act which it was sought by the writ of mandamus to have done. The chancery suit would be final only as between the immediate parties to it, and a decree would not bar a suit of the same nature by each property owner, and thus the commissioners might be delayed indefinitely in the performance of their duties,—so it was considered more complete justice could be done by means of the writ of mandamus, and it was awarded.

This is an application to this court for a peremptory writ of mandamus. The opinion contains a statement of the case.

Messrs. BECKWITH, AYER & KALES, for the relators.

Messrs. STORRS & WILSON and Mr. JOHN J. McKINNON, for the respondent.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This is an application by John M. Wilson and others, styling themselves South Park Commissioners, for a peremptory mandamus against Edward S. Salomon, the clerk of the county court of Cook county, to compel him, as such clerk, to receive and file in his office, forthwith, a certain estimate transmitted to him by the petitioners, of the amount of money that they allege will be required to be raised by taxation the next

succeeding year, for the improvement, maintenance and government of the South Park ; and to compel him to proceed to levy or assess the amount certified in such estimate, upon the taxable property in the towns of South Chicago, Hyde Park and Lake, in the next general tax warrants, for the collection of State and county taxes in those towns.

It is stipulated, that the petition shall stand in the place of an alternative writ, to which a motion to quash has been interposed, so that, the question, whether certain acts of the general assembly mentioned in the petition, are so far valid, that the amount certified to the respondent by the South Park Commissioners, ought to be levied and collected as a tax as provided in those acts, and the further question, whether the relators are precluded of their remedy by mandamus, by reason of the pendency of a suit, by injunction particularly mentioned in a stipulation on file, may be fully presented and decided.

The opinion alleges, that on the 24th of February, 1869, an act of the general assembly of this State was duly approved, entitled, " an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake."

By section one of this act, the governor of the State was required to appoint five persons, who, and their successors, are constituted a board of public park commissioners, to be known under the name of the South Park Commissioners, each of the commissioners, before entering upon the duties of his office, was required to take an oath, well and properly to discharge the duties of his office for the interest of the public, and to give a bond in the penal sum of fifty thousand dollars, with one or more sureties to be approved by the judge of the circuit court of Cook county, payable to the treasurer of Cook county, conditioned for the faithful discharge of their duties under the act.

By section 2, provision is made for fixing the terms of office of the several members, and for organizing, by the election of

one of their number as president, and one of their number as auditor, and by the appointment of a treasurer, who should be required to give a bond, with not less than three sufficient sureties, for the faithful discharge of his duties, in the penal sum of five hundred thousand dollars, to be approved by the judge of the same circuit court. A secretary was required to be chosen; a seal to be adopted, which they could alter at pleasure; a record to be kept of their proceedings; no compensation allowed the commissioners, except to the president; vacancies to be filled by appointment of the judge of the circuit court of Cook county, and the board is declared a body politic and corporate, and to have and enjoy all the powers necessary for the purposes of the act.

Those purposes are declared by the fourth section, which are, the selection of certain described lands by the commissioners, within ninety days after their organization, situate in the towns of South Chicago, Hyde Park and Lake, which lands, when acquired, are to be held, managed and controlled by them and their successors, as a public park, for the recreation, health and benefit of the public, and free to all persons forever, subject to such necessary rules and regulations for the well ordering and government of the same, as the commissioners, or their successors, may adopt.

The fifth section, gives the commissioners power, if they and the owner of any of the lands cannot agree, to proceed to condemn them.

Provision is made by section seven, for the appointment of assessors to assess the benefits and damages.

The eighth section is as follows:

"For any deficiencies arising through acquiring title to said park, and for the payment of the expenses of enclosing, maintaining and improving the park herein provided for, and the expenses, disbursements and charges in the premises, the said commissioners shall have power to loan or borrow, from time to time, for such time as they shall deem expedient, a

sum of money not exceeding two millions of dollars, and shall
have authority to issue bonds, secured upon the said park and
improvements, which bonds shall issue under the seal of said
commissioners, and shall be signed by said commissioners, and
countersigned by the secretary of said board, and bear interest
not exceeding seven per cent. per annum ; and it shall be the
duty of said commissioners to keep an accurate register of all
bonds issued by them, showing the number, date and amount
of each bond, and to whom the same was issued, and said
register shall at all times be open to the investigation of the
public ; and for the payment of the principal and interest of
said bonds, the said park and improvements shall be irrevocably
pledged, and the towns of South Chicago, Hyde Park and
Lake shall be irrevocably bound ; and said bonds may be sold
by said commissioners, upon such terms and for such prices as
in the judgment of said commissioners, can be obtained for the
same in cash."

Section nine provides as follows :

" The said board of park commissioners shall, annually, on
or before the first day of December in each year, transmit to
the clerk of the county court of Cook county an estimate, in
writing, of the amount of money, not exceeding in any one
year three hundred thousand dollars, necessary for the pay-
ment of the interest on the bonds issued by said board, and
that in addition thereto will be required for the improvement,
maintenance, and government of said park during the current
year; and the said clerk shall proceed to determine what per
cent. said sum is on the taxable property of said towns, accord-
ing to the several assessors' returns for the respective year,
and shall in the next general tax warrants for the collection of
State and county taxes in said several towns, set down the
amount chargeable to the several persons, corporations, lots or
parcels of ground, in a separate or appropriate column, and
shall receive such compensation as now allowed by law ; and

the collectors respectively shall proceed to collect the same in the manner now provided by law for the collection of State and county taxes; and all the provisions of law, in respect to the collection of State and county taxes, and proceedings to enforce the same, so far as applicable, shall apply to said assessments and taxes. The said sum of money shall be placed by the treasurer of the said county of Cook, to the credit of said board of park commissioners, and shall be drawn by said board from the county treasury by warrant, signed by the president and secretary of the board and countersigned by the auditor, to be appointed as aforesaid, and in no other way; the appointment of such auditor and comptroller having been first duly certified by such president and secretary, and filed in the office of said treasurer of Cook county."

Section 13 is as follows :

" The said board shall have the full and exclusive power to govern, manage and direct said park ; to lay out and regulate the same ; to pass ordinances for the regulation and government thereof; to appoint such engineers, surveyors, clerks and other officers, including a police force, as may be necessary ; to define and prescribe their respective duties and authority ; fix the amount of their compensation ; and, generally, in regard to said park, they shall possess all the power and authority now by law conferred upon, or possessed by, the common council of the city of Chicago, in respect to the public squares and places in said city ; and it shall be lawful for them to commence the improvement of said park as soon as they have obtained one hundred acres of the premises herein described."

Section 18 provides for an election to be held in these towns on the fourth Tuesday of March next after the passage of the act, at which election the legal voters were required to vote for or against the act, the tickets to be printed " For Park" and

"Against Park," and if a majority of the votes cast be " for Park," then the act is to take effect and be in force, and not otherwise. Ample provision is made for holding the polls and for canvassing the votes as for the election of State and county officers, and the clerk of the county court, was required, immediately after the canvass, to cause a certificate of the result to be filed in the office of the secretary of State.

The nineteenth section makes the act a public act, and to take effect and be in force from and after its passage.

By an amendatory and supplemental act, approved April 16, 1869, it was provided among other things by section 2, that

" The bonds authorized to be issued by the act of which this is amendatory and supplemental, may be issued, sold, and the proceeds applied for acquiring said lands, and for any and all purposes in the said act mentioned. Said bonds shall be retired and canceled as fast as the money for that purpose can be obtained, by the collection of the money due upon the special assessment provided for in section seven of the act hereinbefore mentioned, and a sufficient amount of any bonds that may be issued by the city of Chicago under any law now in force or hereafter enacted, and received by said commissioners, shall be applied to the purpose of retiring the bonds authorized by said act."

The third section amends the ninth section by substituting the next succeeding year, for the current year.

The sixth section confirms and legalizes the election held on the 23d of March, as required by section 18, of the original act. Section seven declares this act to be a public act and to be in force from and after its passage.

These portions of the original and supplemental acts are those upon which the questions arise, and which we consider necessary to be examined in order to a proper understanding of the case.

The petition alleges that this act was duly submitted to the legal voters of the towns of South Chicago, Hyde Park and Lake at an election held within them, on the day specified in

the act, for their approval or rejection, at which election a large majority of the votes cast in each of those towns was in favor of the park provided for in the act, a certificate of which was filed by the clerk of the county court with the secretary of State. It alleges the corporation created by the act had duly organized, having in all things complied with the provisions of the act creating it; that the lands had been selected and that they had purchased and acquired the title to one hundred acres and upwards of the lands selected, and they allege they are now negotiating for the purchase of, and expect soon to acquire the title to, the residue; that they have issued and sold bonds to the amount of one hundred and twenty-five thousand dollars to provide money to pay for these lands, and that they expect and intend soon to issue and sell a large additional amount of bonds for the same purpose.

It is further alleged, that on the 24th of May, 1869, they, as the Board of South Park Commissioners, passed a preamble and resolution, which was duly entered on their record, a certified copy of which, under the seal of the board, they did on that day transmit to the respondent, as clerk of the county court of Cook county, accompanied by a communication, in writing, signed by all the members of the board, which preamble and resolution are as follows :

" WHEREAS, This board is required by its act of incorporation, and a subsequent act of the general assembly amendatory thereof and supplementary thereto, to transmit annually, on or before the first day of December, in each year, to the clerk of the county court of Cook county, an estimate in writing, of the amount of money, not exceeding in any one year three hundred thousand dollars, necessary for the payment of the interest on the bonds issued by said board, and that in addition thereto will be required for the improvement, maintenance and government of the park provided for in said acts during the next succeeding year :

*Be it therefore Resolved,* That the sum of three hundred thousand dollars be, and the same hereby is, designated for such purposes, which this board hereby estimate as necessary for the same; and that this amount be certified in writing, by the secretary of this board, under the seal thereof, to the clerk of the county court of Cook county, as the estimated amount of money that will be necessary and required by this board, during the next succeeding year, for the purposes above mentioned; and further, that the said clerk be requested to assess the same upon the taxable property of the towns of South Chicago, Hyde Park and Lake, in the next general tax warrants for the collection of State and county taxes in said several towns, agreeably to the provisions of the ninth section of the act first above referred to, entitled " an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake," approved February 24th, 1869, as amended by the act amendatory of and supplementary to said first named act, approved April 16th, 1869."

The communication from the board accompanying the above, was of the following tenor:

" CHICAGO, May 24, 1869.
" To Gen. EDWARD S. SALOMON,
" *Clerk of the County Court of Cook County :*
" SIR—The undersigned, constituting the Board of South Park Commissioners, transmit herewith a certified copy of a preamble and resolution passed by the said board on the 24th instant, specifying the estimated amount of money that will be necessary and required, during the next succeeding year, for the payment of the interest on the bonds issued by said board, and for the improvement, maintenance and government of the park therein referred to. The estimate, as you will perceive, is three hundred thousand dollars.

" You will please place this communication on file in your office; and you are hereby requested to assess the amount

above mentioned, for the purposes herein specified, on the taxable property of the towns of South Chicago, Hyde Park and Lake, in the next general tax warrants for the collection of State and county taxes in said several towns, agreeably to the provisions of section 9 of the act approved February 24th, 1869, entitled "an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake," as amended by the act amendatory of and supplementary to said first named act, approved April 16th, 1869.

"Very respectfully," &c.

This communication, with the preamble and resolution of the board, was returned by the clerk on the 25th of May, with a communication from him, in which he says : as a suit has been commenced against him, as well as the commissioners in the Superior Court of Chicago, to enjoin him from levying the tax referred to in the resolution, he cannot consistently, receive these documents and declines to place either of them on file in his office. He further says, he has decided not to levy or assess a tax for the purpose specified, until he is required by a court of competent jurisdiction, and he desires his letter to be considered as an official and positive refusal on his part to comply with the request of the commissioners.

The stipulation to consider the petition as an alternative writ, the motion to quash performs the same office as a general demurrer to the writ, and brings the law of the case fully before us. All the facts which are well pleaded, are admitted by the motion, and the question is distinctly raised, is there enough shown in the petition to entitle the relators to a peremptory writ of mandamus ? The refusal of the clerk to do the duty enjoined upon him by the ninth section of the act, is positive and peremptory, and we are to inquire if he is justified therein by any want of validity in the act itself, for it is upon that and that alone, the justification is claimed.

The respondent makes several points of objection to granting the writ, which we will now consider.

He denies that the relators are invested by the act cited, with authority to issue and sell bonds which shall be a charge upon the towns of South Chicago, Hyde Park and Lake, no legal and competent means having been provided for their payment.

The argument is, that the manner in which the power to to acquire the land is proposed to be exercised is in violation of section five of article nine of our constitution. That provision is, that the corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same, and the legislature shall require that all the property within the limits of municipal corporations shall be taxed for the payment of debts contracted under the authority of law.

We have held in *Harward* v. *The St. Clair and Monroe Levee and Drainage Company*, reported *post.* page 130, and in the case of *The People ex rel. McCagg* v. *The Mayor, &c., of Chicago, ante.* p. 17, that this clause must be construed as a limitation upon the power of the legislature to authorize any other than corporate authorities to assess and collect local taxes. But while this provision limits the objects of local taxation to corporate purposes, and the delegation of the power of taxation to the corporate authorties of counties, townships, school districts, cities, towns and villages, it clearly does not prevent the legislature from creating districts by the union of two or more towns in the same county for any special township purpose; such as building a bridge, improving a river on which they may be situate, or constructing a canal with the consent of those towns, and erecting over such district an authority likewise with their consent, to which shall be granted all the necessary power of taxation for the construction of the improvements and for their government and control.

By our constitution, taxation is apportioned upon property by the rule of uniformity, and to do this, there must be

taxation districts. A State tax is apportioned throughout the State, as a county tax is throughout a county, or a city tax throughout a city, while in the case of a mere local improvement, such as a public park, benefiting more immediately these particular towns, where is the constitutional incompetency of the legislature to be found, to arrange those towns into a special taxation district, within which the expense shall be apportioned and whose people and property shall bear the burden they have themselves imposed? If the legislature has power, for any purpose they may deem beneficial, to abstract from the powers they have granted to a municipal corporation, and to curtail their territorial jurisdiction, and this is not denied, what reason can be urged why they should not, with the assent of the people to be affected by the measure, place over them an authority for a special purpose, with the powers granted to the relators?

To say, that such an act is forbidden by the constitution, is not enough. The prohibition must be found either in the express letter of that instrument or in its spirit and true intention and meaning. Conceding then that corporate authorities of counties, &c., can alone assess and collect taxes for corporate purposes, it by no means follows that the legislature cannot, should the public exigencies require it, of which they must be the judge, establish districts by the union of two or more municipal corporations, and place their government entirely under the control of the corporate authorities of such districts, bestowing upon them, among others, the taxing power?

The whole legislative power of the State, is conferred by the constitution, upon the general assembly, composed of two houses, the members of both to have certain qualifications and to be elected by the people. It follows, therefore, that every subject, not withdrawn from them by the constitution, and which is within the scope of civil government, can be dealt with by that body, and as it may act upon the State at large by general laws affecting the

4—51ST ILL.

whole country, and all the people, so it may, in its discretion, there being no prohibition expressly made, or necessarily implied, make special laws to relate only to separate districts or portions of the State. The members of the two houses, are the constitutional agents of the public will in every district or locality of the State, and they may therefore, so arrange the powers to be given and executed therein, as convenience, the efficiency of administration, and the public good may seem to require, by committing some functions to local jurisdictions already established, or by establishing local jurisdictions for that express purpose.

The clause in the ninth article, on which so much stress is laid, that the legislature *may* vest the corporate authorities of counties, cities, &c., with the power to assess and collect taxes, does not confine the legislature to any particular corporate authorities, or to any then known instrumentalities of that character. That instrument was made for all time, with full knowledge that the public necessities might require the creation of various and dissimilar corporate authorities, and to be imbued with administrative functions of a nature which could not be properly exercised by any known and existing corporate authority.

There is no prohibition which we have been able to discover, and we have been pointed to none, against the creation by the legislature, of every conceivable description of corporate authority, and when created to endow them with all the faculties and attributes of other pre-existing corporate authorities. Thus, for example, there is nothing in the constitution of this State, to prevent the legislature from placing the police department of Chicago, or its fire department, or its water works, under the control of an authority which may be constituted for such purpose by a vote of the people, and endow it with power to assess and collect taxes for their support, and confide to it their control and government. Section five of article nine, would not be violated thereby, because the authority thus established, would be a corporate authority, and the

purposes for which taxes could be assessed, are, undeniably, corporate. These relators are made a body politic and corporate, with perpetual succession and with a seal, and though appointed by the governor, they are a corporate authority within the meaning of the constitution, as the people of the towns named, have consented, by their votes, to the mode of appointment. By their votes, they have, by large majorities, adopted this act, thus making the relators, or commissioners, corporate authorities *pro hac vice* for the purposes of this park, and have consented to the creation of this debt. We lay no stress upon the fact, that the commissioners are, nominally, a corporation, for we do not hold it is in that capacity they can issue bonds or levy taxes to bind the people of these three towns, but as township or corporate authorities whose appointment has been assented to by the people within their jurisdiction.

The constitution nowhere commits corporate objects or purposes irrevocably, to authorities now existing, nor does it prohibit the committal of them to such corporate authority as may be called into life by the same law which creates the subject and commits it to their jurisdiction.

The union of these towns was for a special purpose, and outside of that purpose, they are left with all their functions undisturbed, precisely as they existed before the passage of the law. Establishing them, with their consent, as a park district, deprived them of none of the franchises bestowed upon them as towns, and curtailed, in no degree the fair proportions of either of them.

The manifest distinction, in brief, between this case and that relating to Lincoln Park, is this : in that case the legislature undertook to compel the people of Chicago to incur a debt without the consent either of the people of the city or of their corporate authorities, for it is impossible to hold that the commissioners of that park were corporate authorities of the city of Chicago. In this case, the people of these three towns, by voting for the law, have made the commissioners corporate authorities

of such towns, and empowered them to, assess the requisite tax upon the property of the towns. The tax is really self-imposed, by means of agents not directly named by the people of these towns, but named by the governor by virtue of authority conferred by their vote.

We come now to consider the other objections made by the respondent's counsel to this act.

One of the counsel for respondent asks, of what character is the corporation, thus endowed with extraordinary, unheard of, and unknown powers and privileges—and after defining the several kinds of corporations, he asks, to which of these divisions of public corporations does the South Park Commissioners belong? The answer is ready and obvious. By the vote of the people within the jurisdiction of their action, they became a corporate authority, *quasi* municipal, the object of their creation being of a municipal character, and of that alone. They became a public municipal corporation, and herein is found the answer to a prominent objection made by another of the counsel for respondent, based upon the fifteenth section of the act, which provides that "the real estate and personal property of said corporation shall be exempted from taxation and assessment." This, the counsel insists, is in the very teeth of the second clause of article nine, which declares that "the general assembly shall provide for levying a tax by valuation, so that every person *and corporation* shall pay a tax in proportion to the value of his or her property." It is argued that this park property belongs to these commissioners as a corporation. This is so, by the terms of the act. They hold the fee, but the *usufruct* is in the public; but holding it, they hold it as a public corporation for public purposes, and was it ever heard, that the property, real or personal, of a public municipal corporation, was subject to taxation? Is Union or Jefferson Park in the city of Chicago assessed for general taxes? Are their water works so assessed, and their public squares, and fire engines, and other articles of personal property in their possession and ownership? The corporations aimed at by the

clause in question, are private, not public, corporations, and such is the universal understanding.

It is further objected, that the fact that a majority of the votes of the three towns has been given to this act, imparts to it no additional validity, for by the scheme of the act, it might be that one of the townships by its large vote could dominate over the other two, and thus subject the minority towns to an onerous burthen imposed without their consent. This might be so, and if so, the case would be like the case of Lincoln Park, in which we held it contrary to the plain behests of the constitution to impose a local burthen of such magnitude, upon an unwilling people without first obtaining the consent of the people to its imposition. When a similar case shall arise, the decision will doubtless be the same, but the facts admitted by the pleadings show a majority of the votes of each of the towns, was cast in favor of the act.

But it is urged, that this assent of the people amounts to nothing; that the legislature had not the power so to submit the enactment of a law, to the popular vote; that as the entire act is submitted to the decision of the people of the towns, it is not a law within the meaning and sense of the constitution. He insists such an act is legislation; that the people by their votes make the law, when that power is exclusively confided to the general assembly.

This is not an open question here. Its discussion is foreclosed by the decision of this court in the case of *The People, &c. v. Reynolds*, 5 Gilman, 1.

That was a case where the legislature had passed an act for the division of Gallatin county and the formation of a new county from the same territory, but to take effect only on the contingency that a majority of the votes given should be cast in favor of such division.

This same objection was made, that the law was not an emanation of the legislative will, but that of the voters of the county sought to be divided. Very able arguments were made in support of the objection, which it is not necessary to

state in detail, it being sufficient to say, they covered the whole
ground and fully exposed the objection in its whole length
and breadth.

In a long and very able opinion by the late distinguished
Chief Justice of this court, then Justice CATON, the constitu-
tionality of the act was maintained, in which his associates
concurred.   The general proposition was discussed, with great
ability, that acts of the general assembly are not, of necessity,
absolute, but may be so framed as to depend upon some
future event or contingency for taking effect.   That the act in
question was complete when it left the legislature, although
its principal provisions were to take effect upon a contingency,
the determination of which did not depend upon the exercise
of legislative powers by the people, but upon an expression
which they were authorized to make, rather in the execution,
than in the enactment, of the law, an expression to be made in
a legitimate and ordinary way.   The court say, if we take the
action of all past legislators as determining what may and
should properly be done in the exercise of legislative powers,
we see, that while they are bound to make the laws, yet those
laws need not be absolute, nor make every provision for doing
that which they may authorize to be done.   While all must be
done under their sanction, yet they need not do all or command
all.   A law may depend upon a future event or contingency for
its taking effect, and that contingency may arise from the vol-
untary act of others.   Of this class. the court says, are all laws
creating private corporations and a very large portion of the laws
creating public or municipal corporations.   If we say that this
is an unauthorized delegation of legislative power, we forget
what is a proper and legitimate exercise of that power.   If
the saying be true, that the legislature cannot delegate its
power, it is so only in its most general sense.   We may well
admit that the legislature cannot delegate its general legislative
authority, still it may authorize many things to be done by
others which it might properly do itself.   "The legislature
may pass all the laws requisite for the government of a

particular city or township or school district, and who will doubt the propriety of its authorizing this to be done by the people within the limits of the city, town or district by their local representatives, or even directly. This is making laws, and laws, too, of as binding efficacy as if passed directly by the legislature."

This case is square on the point now under discussion and necessarily disposes of it.

For a most exhaustive discussion of this subject, we refer to the cases of *Alcorn* v. *Horner,* and the *Same* v. *Hill,* 38 Mississippi, 652 where all the authorities *pro* and *con* are collated and commented upon with signal ability, and wherein a decision was pronounced in conformity to that in *The People* v. *Reynolds, supra.* In these cases it was held, that the power to enact laws necessarily included the right in the law-making power to determine and prescribe the conditions upon which the law in a given case, shall come into operation or be defeated, and this contingency may as well be the result of the vote of the people of the locality to be affected by the law as any other.

The law of this case was discussed by the counsel and court with great power and ability, and may be read with profit and instruction.

The remaining point is, the effect of the pendency of the chancery suit to enjoin these relators from proceeding under this law.

In the case of *The People ex rel. Mitchell* v. *Warfield,* 20 Ill. 160, which was a contest about the removal of the county seat of Saline county, and where a mandamus was applied for to compel certain official acts to be done by the respondent, at the county seat, so claimed by the relator, and in the case of *The People ex rel. etc.* v. *Wiant,* 48 Ill. 263, which was also a contest growing out of the removal of the county seat of DuPage county, where a mandamus was applied for to compel the county treasurer to keep his office at the new county seat, and in both of which cases bills of injunction had been filed, and

in which were contested facts. We said, as the parties had commenced proceedings in another tribunal to obtain an adjudication of the question, this court would not, except in extraordinary cases, interfere by mandamus.

In these cases facts were contested; in this, there are no controverted facts, the whole issue being on questions of pure law.

As the granting of a mandamus is a matter of discretion with the court, it was refused in the cases cited, because it was the opinion of the court, the matters in controversy could be well determined in the suits pending.

But looking at the nature of the questions involved in this case, we are satisfied they cannot be appropriately or finally determined in the suit pending and complete justice done therein to all the parties, for however the pending case may be determined, it will be no bar to a suit of the same nature brought by another property owner, and so on until the list of owners is exhausted, and the duties cast upon the relators by the law, must remain unperformed for an indefinite time. Justice cannot be done to them as public functionaries, nor to the public, by the determination of that suit, in whatever way it may be decided, as it would dispose alone of that case, leaving the opportunity open of bringing other suits of the same kind in endless succession.

In conclusion, with the best lights we have, we are satisfied the relators have shown a clear legal right to the writ for which they pray, and that they have no other adequate remedy to meet the exigencies of the case, and accordingly disallow the motion to quash, and direct a peremptory mandamus to issue as prayed.

*Mandamus awarded.*