## MARSHALL J. WILSON

### *v.*

## BOARD OF TRUSTEES OF THE SANITARY DISTRICT OF CHICAGO *et al.*

*Filed at Ottawa June 12, 1890.*

1. LEGISLATIVE POWER—*constitutional limitation, as distinguished from a grant of power.* The constitution of the State is not to be regarded as a grant of power to the legislative department, but, on the contrary, it is to be taken as a limitation upon its powers.

2. SAME—*strict construction—in favor of legislative power.* Language in a constitution restricting the legislative power of the General Assembly must be construed strictly, and unless it clearly appears that legislation is within the terms of the restriction, it will be sustained. If it be doubtful, the doubt must go in favor of the validity of the action of the legislature.

3. MUNICIPAL CORPORATIONS—*new corporations within one already existing.* The constitution, in providing for the organization of counties and county government, also contemplates that there will be local governments for public purposes, designated as cities, towns, villages, school districts, and "other municipal corporations." But there is no specification of the powers that shall be conferred upon either, and no prohibition of the withdrawal of powers once conferred, and thereafter conferring them upon another. In these respects the present constitution does not differ from the constitutions of 1818 and 1848.

4. If the legislature may vest the power in cities, towns and villages to construct sewers, drains, etc., for sanitary purposes, and may also create a corporation within the county and invest it with like power, it follows that it may create a corporation including both city and county, and invest it with power to secure the public health by means of sewers and channels, or drains.

5. There are no constitutional restrictions as to the boundary lines of public or municipal corporations within which new corporations may be formed, except as to counties. It is wholly unnecessary that the corporate authorities of the new corporation shall be also the corporate authorities of some specific pre-existing corporation.

6. So it will violate no principle of constitutional law to create a district, and vest it with the powers of taxation for sanitary purposes, co-extensive with the territory to be controlled. The propriety of the creation of such a municipal corporation belongs alone to the General Assembly, and not to the courts.

7. SAME—*the public health—to be subserved under the police power.* The preservation of health is one of the paramount objects of government. It belongs to the police power, subject to the proper exercise of which, either by the State legislature, or by public corporations, to which the legislature may delegate it, every citizen holds his property.

8. The police power, so far as it relates to the public health, includes the making of sewers and drains for the removal of garbage and filth, the boring of artesian wells and the construction of aqueducts for the purpose of procuring a supply of pure, fresh water, the drain of malarious swamps, and the erection of levees to prevent overflows.

9. SAME—*creating sanitary districts—local improvements—municipal taxation—special assessments—constitutional provisions.* The constitution of 1870 authorizes the legislature to invest cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise, and also provides that for all other corporate purposes all municipal corporations may be vested with authority to assess and collect taxes, etc. The words "municipal corporations," in this connection, are used in their ordinarily accepted and more enlarged sense of public, local corporations, exercising some governmental functions.

10. Instead of the General Assembly being, under the present constitution, restricted as to the municipal corporations which it may invest with power to assess and collect taxes for municipal purposes, as it was under the constitution of 1848, it is entirely unrestricted, and the General Assembly may now as readily change such corporations as it could under the constitution of 1848.

11. At the time of the adoption of the present constitution it was held, and has since been held, that the words "special assessment," mean an assessment to pay for an improvement for public purposes, upon real property which is, by reason of the locality of the improvement, specially benefited beyond the benefits by the improvement to real property generally throughout the municipality. When property is not thus benefited, the improvement can.not be made by special assessment.

12. Section 31, article 4, of the constitution, relating to drainage by special assessment, is to be construed by keeping in view the other sections of that instrument in force prior to its adoption, and the fact that its manifest purpose and effect are only a modification and amendment of those sections.

13. It is manifest that the first clause of section 9, of article 9, of the present constitution, was adopted to remove restrictions on the power of the General Assembly held to exist under the constitution of 1848, in the *Larned case,* and other like cases, and to enable the General Assembly to authorize the making of local improvements by the levy of the cost on contiguous property, according to its frontage.

14. This court has also held that the first clause of section 9 of article 9 of the constitution is a prohibition against special assessments by the corporate authorities of other municipalities than those of cities, towns and villages.

15. The words "local improvements," in that section of the constitution which declares that "the General Assembly may vest the corporate authorities of cities, etc., with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise," mean improvements that can be made by special assessment. Whether an improvement is of that character that it can be made by special assessment is a question of fact,—not of law.

16. And in the same section, which reads, "the General Assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise," the words, "or otherwise," mean "or otherwise assessing the cost of the improvement against the property actually or presumptively benefited thereby," that being the kind or class of assessments particularly mentioned.

17. The words "by special assessment," were not used to prevent any restriction that would otherwise have existed under the present constitution, but they express a mode of making a local improvement in contradistinction to that by general taxation, and were so used, in connection with the words "or by special taxation of contiguous property," to limit the local improvements which cities, towns and villages only could make, to those modes.

18. While municipal corporations other than cities, towns and villages shall not be authorized to make local improvements by special assessment, or by special taxation of contiguous property, they may be authorized to make them by general taxation. In this view it is probable that the words "or otherwise" were used to exclude the possibility of misapprehension that because only cities, towns and villages could be authorized to make local improvements "by special assessment," "or by special taxation of contiguous property," they could not be authorized to make them by general taxation.

19. The words "for other corporate purposes," in the second clause, can not be held to mean "for other corporate purposes than those of local improvement," but must mean "for other corporate purposes than those of local improvement by special assessment or by special taxation of contiguous property," because it is the *manner* of making local improvements, and not the *fact* of making them, that is the subject of the first clause.

20. The constitution was intended to cover the entire field of taxation,—the first clause, that of making local improvements by a mode different from that of general taxation, in which the cost of the im-

provements is assessed against the property actually or presumptively benefited thereby; and the second, clause that of general taxation, in which the rule of uniformity as to persons and property taxed shall be observed.

21. In the light of the previous decisions of this court, section 9 of article 9, or so much thereof as relates to municipal taxation, is to be regarded as prohibiting the General Assembly, as follows: First, the General Assembly shall not authorize taxes to be imposed by the corporate authorities of municipal corporations otherwise than uniformly upon persons and property within the jurisdiction of the body imposing the same, except in cases of local improvements by cities, towns and villages; and second, no municipal corporation other than cities, towns and villages shall be authorized to make local improvements by special assessment, by special taxation of contiguous property, or by otherwise assessing the cost of the improvement against the property actually or presumptively benefited thereby.

22. Before the adoption of section 31 of article 4 of the constitution, drainage districts could not be invested with power to make local improvements by special assessment — only cities, towns and villages could be invested with such power. Since its adoption, drainage districts, as well as cities, towns and villages, can make local improvements by special assessments, but not by special taxation of contiguous property. The amendment of section 31 operated as a removal of the previous constitutional restriction upon the power of the legislature, and not as a grant of power.

23. The power of the General Assembly to authorize the formation of sanitary districts, and to invest their corporate authorities with power to levy and collect general taxes for corporate purposes, is entirely unaffected by section 31 of article 4 of the constitution, as adopted in November, 1878, and is not prohibited by any part of the constitution.

24. SPECIAL LEGISLATION—*extent of prohibition—as to drainage or sanitary districts.* Section 22 of article 4 does not prohibit the formation and regulation of municipal corporations, other than cities, towns and villages, by special legislation. The prohibition of such legislation does not apply to drainage districts or sanitary districts.

25. The clause in section 22 of article 4 of the constitution, that no special law shall be enacted where a general law can be made applicable, is addressed to the General Assembly, and is not the subject of review by the courts.

26. MUNICIPAL INDEBTEDNESS—*constitutional limitation—in case of several municipal corporations within the same territory.* The constitutional limitation upon the extent of corporate indebtedness applies to each municipal corporation singly. Where one such corporation may partially embrace the same territory as others, it may contract corporate

indebtedness without regard to the indebtedness of any other corporate body embraced wholly or in part in its territory.

27. CONSTRUCTION OF STATUTES—*general words following particular words.* It is a rule of construction of statutes, that where general words follow particular words, the former can mean only things or persons of the same kind or class as those which are particularly mentioned.

APPEAL from the Circuit Court of Cook county; the Hon. OLIVER H. HORTON, Judge, presiding.

This was a bill for an injunction. Omitting the caption, the bill is as follows:

"Marshall J. Wilson, humbly complaining, shows unto your Honors that he is a resident and legal voter of the sanitary district hereinafter described, and that he is, and for many years has been, the owner of real estate situated within the limits of said sanitary district, and that he is also the owner of personal property situated within said sanitary district; that in pursuance of an act passed by the General Assembly of the State of Illinois, entitled 'An act to create sanitary districts, and to remove obstructions in the DesPlaines and Illinois rivers,' approved May 29, 1889, and in force July 1, 1889, the sanitary district of Chicago has been organized; that said sanitary district of Chicago, so organized, has the following boundaries, to-wit: All of the territory embraced within the limits of the city of Chicago, except the portion thereof lying south of the township line, between townships thirty-seven (37) and thirty-eight (38) north, range fifteen (15), east of the third principal meridian, and which excepted portion of said city is that portion thereof south of Eighty-seventh (87th) street in said city, the foregoing territory including all the territory embraced, prior to the recent annexation, in the city of Lake View, in the village of Jefferson, in the town of Lake, in the portion of the town of Cicero then annexed to Chicago, and in Hyde Park north of the said township line and said Eighty-seventh street; also, all of the territory embraced in the incorporated town of

Cicero, and also all of the territory embraced in the incorpo-
rated village of Lyons, and also all of the territory of the town-
ship of Lyons lying in range thirteen (13), east of the third
principal meridian, and in sections one (1), two (2), eleven (11),
twelve (12), thirteen (13), fourteen (14), twenty-three (23) and
twenty-four (24) of said township of Lyons lying in range 12,
east of the third principal meridian,—the foregoing being an
area of contiguous territory situated in the county of Cook and
State of Illinois; that said sanitary district included within
its limits the greater part of the city of Chicago, the whole of
the town of Cicero and the village of Riverside, and other
territory; that at the date of the passage of the said act, and
when the same took effect, the territory now included within
said sanitary district included within its limits the whole of
the city of Chicago, the whole of the city of Lake View and the
whole of the town of Lake, a large part of the village of Hyde
Park, and the whole of the incorporated town of Jefferson, and
a part of the town of Cicero and the village of Riverside; that
each of the said cities, towns and villages had a bonded debt,
which is still outstanding and unpaid; that the bonded debt
of the city of Chicago on the first day of July, 1889, exceeded
five per centum on the value of the taxable property therein,
as ascertained by the assessment for State and county taxes
for either of the years 1888 and 1889; that subsequent to the
first day of July, 1889, the limits of the city of Chicago were
enlarged, by incorporating into said city, in pursuance of law,
the village of Hyde Park, the town of Lake, the city of Lake
View, the town of Jefferson and part of the town of Cicero,
and other territory; that the aggregate municipal indebtedness
of the city of Chicago outstanding prior to the enlargement of
its limits as above stated, together with the municipal indebt-
edness of the city of Lake View, the town of Jefferson, the
village of Hyde Park, and the town of Lake, and which still
remains outstanding and unpaid, exceeds five per centum of
the value of the taxable property within the present limits of

said city of Chicago, as ascertained by the assessment for State and county taxes for the year 1889.

"Complainant further states, that within the limits of said sanitary district there are many other public corporations having bonded debts, including school districts, park boards, and other similar municipal or *quasi* municipal corporations.

"Complainant further states, that the board of trustees of said sanitary district have organized, in pursuance of the act hereinbefore mentioned, by the election of a president and other officers, and that at a meeting of said board of trustees, held on the 8th day of February, 1890, the following ordinance was duly passed by said board of trustees:

"'An Ordinance providing for the issue and sale of Bonds of the Sanitary District of Chicago.

"'*Be it ordained by the Board of Trustees of the Sanitary District of Chicago:*

"'Section 1.   That interest bearing coupon bonds, to the amount of $1,000,000, be issued by the sanitary district of Chicago, said bonds to be each for the principal sum of $1000, payable on the first day of January, A. D. 1910, to bear date on the 15th day of February, A. D. 1890, to be numbered consecutively, 1 to 1000, inclusive, to bear interest at the rate of three and one-half ($3\frac{1}{2}$) per cent per annum from the date thereof, the interest to be payable on the first day of January and the first day of July in each year, upon presentation and surrender of the proper interest coupons, the interest to be evidenced by forty coupons attached to each bond, to be numbered consecutively, and each coupon to bear the number of the bond to which it is attached,—the first or No. 1 coupon on each bond to be for the sum of $13.12, and each of the remaining coupons to be for the sum of $17.50,—the first or No. 1 coupon on each bond to be payable on the first day of July, 1890, and the next or No. 2 coupon on said bond to be payable on the first day of January, 1891, and so on, each suc-

29—133 Ill.

ceeding coupon being payable six months after the preceding one, both principal and interest to be payable at the 'Northern Trust Company,' at Chicago. Said bonds shall be signed by the president of the board of trustees, countersigned by the clerk, and attested by the corporate seal of said sanitary district.

" 'Sec. 2. That said bonds shall be sold at such times and for such rates as the board of trustees of said district may, from time to time, determine and direct, and the proceeds arising from the sale of said bonds shall be paid to the treasurer of said district, and shall be used for the corporate purposes of said district, as directed, from time to time, by the board of trustees of said district.

" 'Sec. 3. That an annual tax sufficient to pay the interest on said bonds as the same shall become due according to the terms thereof, and sufficient also to provide an adequate sinking fund for the final payment of the principal sum of said bonds herein provided for, on the said first day of January, A. D. 1910, to-wit, the sum of eighty-five thousand dollars ($85,000), be assessed and levied annually hereafter on the taxable property of said sanitary district of Chicago, and shall be certified annually, until the maturity of said bonds, to the county clerk, to be extended on the proper collection warrants, according to law; and the clerk of the said district is hereby authorized and directed to include said sum in the amount which shall be certified to the county clerk in each year as the amount required to be raised by taxation in said district.

" 'Sec. 4. That the credit of the sanitary district of Chicago be and the same is hereby irrevocably pledged to the payment of any and all said bonds in this ordinance provided for, and the interest thereon.'

"Complainant further states, that in pursuance of said ordinance said board of trustees are about to place upon the market and sell the bonds of said sanitary district, and to pledge, for the payment thereof, the property of said district, and that in pursuance of said ordinance said board of trustees are about

to certify and levy a tax upon all the taxable property within the limits of said district, including the property of your petitioner, to pay the interest on said bonds, and to provide a sinking fund for the payment of the principal thereof; and your orator is informed and believes, and charges the fact to be, that said board of trustees, unless restrained by this honorable court, will issue and sell said bonds of said sanitary district in pursuance of said ordinance, and will levy taxes upon all the property of said district for the payment of said bonds and the interest accruing thereon; and complainant charges that said sanitary district is a drainage district, within the meaning of section 31 of article 4 of the constitution of the State of Illinois, as amended in 1878, and that by virtue of said section 31 of said article 4, said sanitary district could only be vested with power to make improvements by special assessments upon the property benefited thereby, and that said sanitary district could not, under the constitution of this State, be vested with power to levy general taxes upon the property within said district, or to issue the bonds of said district and pledge the property thereof for the payment of such bonds, or to issue bonds which should be payable otherwise than out of special assessments upon the property benefited thereby.

"Complainant charges, that under the facts herein stated said sanitary district is prohibited, by section 12 of article 9 of the constitution of the State of Illinois, from becoming indebted in any manner or for any purpose, and that said proposed issue of bonds would, for that reason, be illegal and void if the same were sold.

"Complainant further charges, that under the facts herein stated said sanitary district is prohibited, by section 9 of article 9 of the constitution of the State of Illinois, from assessing and collecting taxes for the purpose of paying such proposed issue of bonds, and that such proposed issue of bonds would be, for that reason, illegal, unconstitutional and void if the same were sold.

"Complainant further charges, that the said act of the General Assembly above referred to is obnoxious to and prohibited by section 22 of article 4 of the constitution of the State of Illinois, and that in consequence, such proposed issue of bonds would be, for that reason, illegal, unconstitutional and void if the same were sold. And he further alleges, that Murry Nelson, Richard Prendergast, John A. King, William H. Russell, John J. Altpeter, Frank Wenter, A. P. Gilmore and Henry J. Willing are acting as trustees of said sanitary district, and were elected as such trustees under and by virtue of the act of the General Assembly aforesaid, and in strict accordance with the provisions thereof, and that they have organized as a board of trustees of said sanitary district, and as such board have done and performed the acts above set out.

"Inasmuch, therefore, as your orator is without remedy by the strict rules of the common law, and to the end that said board of trustees of the sanitary district of Chicago, and said Murry Nelson, Richard Prendergast, John A. King, William H. Russell, John J. Altpeter, Frank Wenter, A. P. Gilmore and Henry J. Willing, may full, true and perfect answer make to all and singular the allegations in this bill contained, without oath, answer upon oath being hereby expressly waived, and that a decree may be entered enjoining and restraining the board of trustees of the sanitary district of Chicago, and said Murry Nelson, Richard Prendergast, John A. King, William H. Russell, John J. Altpeter, Frank Wenter, A. P. Gilmore and Henry J. Willing, from issuing or selling the bonds so ordered, as above set out, or from causing any general tax to be levied or assessed for the payment of such bonds or any portion thereof, or the interest thereon; and that your orator may have such other and further relief in the premises as may be agreeable to equity and good conscience, and to your Honors may seem meet.

"May it please the court to grant unto your orator the People's writ of summons, directed to the sheriff of Cook county, to serve in accordance with the practice of this court."

The defendant demurred to the bill, and the court sustained the demurrer, and decreed that the bill be dismissed. The questions discussed in the opinion arise on this demurrer.

The statute under which the sanitary district is formed is entitled "An act to create sanitary districts, and to remove obstructions in the DesPlaines and Illinois rivers," and was approved May 29, 1889. The first section provides, that "whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the drainage thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district." The balance of the section relates to the mode of becoming incorporated—by petition and election, etc. The third section provides, that in each sanitary district organized under this act, there shall be elected nine trustees. They shall choose one of their number to be president, and shall constitute a body corporate and politic, by the name and style of "The Sanitary District of . . . . . . . .," and by that name and style may sue and be sued, etc. The fourth section declares, that such trustees shall be the corporate authorities of such sanitary district, and they are invested with power to adopt ordinances, etc. The seventh section provides, that trustees of any such sanitary district shall have power to provide for the drainage of the same, etc. The ninth section provides that the corporation may borrow money for corporate purposes, and issue their bonds therefor, but limits the indebtedness that may be contracted, to an amount in the aggregate not exceeding five per centum on the valuation of taxable property therein, as provided by section 12, article 9, of the constitution. The twelfth section authorizes the trustees to levy and collect taxes for corporate purposes upon property

within the territorial limits of such sanitary district, etc. The other provisions of the act are not material to an understanding of the questions discussed in the opinion.

The case comes to this court by the appeal of the complainant. Errors are assigned, bringing in question the ruling of the court in sustaining the demurrer and dismissing the bill.

Mr. A. M. Pence, for the appellant:

The provisions of the State constitution operate as limitations upon the General Assembly, without which limitations its powers are as omnipotent as the English parliament.

By section 9 of article 9 of the constitution, the General Assembly could only confer upon the corporate authorities of cities, towns and villages the power to make a local improvement by special assessment, or otherwise. This, by implication, prevents municipal corporations other than cities, towns and villages, from making such local improvement.

The second clause of section 9, article 9, of the constitution, provides, that "for all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes," etc. These provisions are a limitation upon the powers of the General Assembly, and no power can be conferred by the General Assembly except those enumerated. *Madison County* v. *People,* 58 Ill. 463; *People* v. *Dupuyt,* 71 id. 657; *Updike* v. *Wright,* 81 id. 49.

The amendment of section 31 of article 4 is a limitation or repeal of section 9 of article 9, so far as it confers upon or limits the power to cities, towns and villages to make such local or drainage improvements by special assessment. *Moore* v. *People,* 106 Ill. 376.

The amendment of the constitution in regard to drainage was in consequence of the decision in *Updike* v. *Wright,* 81 Ill. 49, and it follows that this amendment, treating of the subject of drainage, excludes or repeals all other provisions of the constitution relating to this subject which might otherwise be

applicable, or to which the legislation after that time might be referred. *Moore* v. *People*, 106 Ill. 382; *Hyde Park* v. *Spencer*, 118 id. 446; *Huston* v. *Clark*, 112 id. 344; *Kilgour* v. *Drainage Comrs.* 111 id. 342; *Owners of Lands* v. *People*, 113 id. 296.

The power conferred by the General Assembly to levy a general tax for this local improvement can not be referred to section 9, article 9, of the constitution. *People* v. *Salomon*, 51 Ill. 37; *People* v. *Brislin*, 80 id. 423; *Dunham* v. *People*, 96 id. 331.

If it could be held that this sanitary board is simply exercising the corporate authority of the city of Chicago, or of any of the other towns, etc., then the power attempted to be exercised is inhibited by section 12, article 9, of the constitution, which provides that no debt shall be created exceeding five per centum of the value of taxable property.

The act is void, as being special legislation. *Owners of Lands* v. *People*, 113 Ill. 296; *People* v. *Cooper*, 83 id. 585.

Mr. EDWARD OSGOOD BROWN, also for the appellant.

Messrs. WILSON & MOORE, for the appellees:

The provision of the statute vesting the corporate authorities of sanitary districts with power to levy taxes, is valid. Const. art. 4, sec. 31; art. 9, sec. 9; art. 9, sec. 5.

The General Assembly can pass any law not prohibited by the State or Federal constitution. *Hawthorn* v. *People*, 109 Ill. 302; *Firemen's Benevolent Ass'n* v. *Lounsbury*, 21 id. 510; *Harris* v. *Supervisors*, 105 id. 445; *Munn* v. *People*, 69 id. 80.

Section 9 of article 9 does not prohibit the granting of the taxing power for corporate purposes, in sanitary districts. *Wetherell* v. *Devine*, 116 Ill. 635; *People* v. *McAdams*, 82 id. 356; *People* v. *Brislin*, 80 id. 423; *People* v. *Harper*, 91 id. 357; *Wilcox* v. *People*, 90 id. 186; *Cornell* v. *People*, 107 id. 372.

Special assessments are a peculiar species of taxation. See Cooley on Taxation, 417, 495, 497.

The outlet of the Chicago drainage district will lie chiefly outside of the city limits, and is therefore not a local improvement. *Hundley* v. *Commissioners*, 67 Ill. 566.

Section 31 of article 4 of the constitution does not prohibit the vesting of the power to tax, in drainage districts. See *Douthett* v. *Kettle*, 104 Ill. 356; *Timm* v. *Harrison*, 109 id. 593.

That the purpose or object of a constitutional provision is to have a controlling effect in determining its construction, was held in the following cases: *People* v. *Marshall*, 1 Gilm. 682; *People* v. *Lœwenthal*, 93 Ill. 191; *Knickerbocker* v. *People*, 102 id. 227; *People* v. *Salomon*, 46 id. 339.

As to the question of the power of the legislature to vest drainage commissioners with power to levy special assessments, as it stood before the amendment of the constitution, see *Updike* v. *Wright*, 81 Ill. 49; *Board* v. *Houston*, 71 id. 318; *Harward* v. *St. Clair Drain Co.* 51 id. 130; *Gage* v. *Graham*, 57 id. 144; *Blake* v. *People*, 109 id. 504.

A law must be clearly unconstitutional before the courts will so pronounce,—not merely doubtful. *Knickerbocker* v. *People*, 102 Ill. 218; *Railroad Co.* v. *Smith*, 62 id. 271; *People* v. *Marshall*, 1 Gilm. 672; *People* v. *Hatch*, 33 Ill. 130; *Supervisors* v. *Railroad Co.* 44 id. 229; *Bunn* v. *People*, 45 id. 397; *McVeagh* v. *Chicago*, 49 id. 318; *Insurance Co.* v. *Swigert*, 104 id. 653; *Wulff* v. *Aldrich*, 124 id. 591.

The sanitary district has the right to become indebted and to issue bonds.

The act for the creation of sanitary districts is not invalid by reason of its being special legislation. *People* v. *Harper*, 91 Ill. 357; *Owners of Lands* v. *People*, 113 id. 296.

Mr. S. S. GREGORY, also for the appellees, made an oral argument.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The contentions in the present case, in behalf of appellant, as formulated by his counsel, are:

*First*—That the sanitary district is a drainage district, within the meaning of section 31, article 4, of the constitution, and that such provision of the constitution is a limitation upon the powers of the General Assembly to authorize such improvement to be made in any other way than as provided therein, viz., by special assessment.

*Second*—That the improvement in question is a local improvement, and, under section 9 of article 9 of the constitution, the corporate authorities of cities, towns and villages, alone, can make the same; that the municipal corporation in question is neither a city nor a town nor a village, nor do the officers thereof exercise the powers of any city, town or village, or of any number thereof in combination.

*Third*—The second paragraph of said section 9, article 9, although it gives all municipal corporations power to assess and levy taxes for all other corporate purposes, it necessarily excludes from such corporations the power to raise revenue by general taxation for the purpose of a local improvement, which this is.

*Fourth*—The indebtedness due from the cities, villages and towns included within the boundaries of this district is much beyond five per cent of the value of the taxable property therein, as ascertained by the last assessment for State and county taxes. Complete power is given to the city of Chicago, under its charter, to prosecute and make the improvement contemplated, and it is manifest that this new corporation was created for the sole purpose of evading section 12, article 9, in regard to the limit placed upon the indebtedness of such city.

*Fifth*—The act in question is a local law, as is apparent. This is not objectionable if the power of the Assembly to pass this act is referred to the drainage section of the constitution,

but if not governed by the drainage section, then it is obnoxious to section 22, article 4, in regard to special legislation. It is an amendment to the City Incorporation act, and it grants privileges and franchises to a corporation by special act.

In the view that we take of these contentions, they involve but three general questions: First, is it within the power of the General Assembly, under our constitution, to authorize the formation of sanitary districts, disregarding the existence and boundaries of pre-existing municipal corporations, and invest their corporate authorities with powers of general taxation for sanitary purposes; second, if this shall be answered in the affirmative, are the corporate authorities of such districts limited in the amount of indebtedness which they may incur under section 12, article 9, of the constitution, by the amounts of pre-existing indebtedness of other municipal corporations covering the same or a part of the same territory; third, is the act under which the district whose corporate authorities are here sought to be enjoined, was formed, local or special legislation, within the prohibition of section 22, of article 4, of the constitution. It will be most convenient for us to observe this order in considering and passing upon the questions discussed in the arguments of counsel.

*First*—It has been stated, and frequently repeated in decisions of this court, that the constitution of the State is not to be regarded as a grant of powers to the legislative department, but that, on the contrary, it is rather to be regarded as a restriction upon its powers,—that the whole legislative power of the State being conferred by the constitution upon the General Assembly, every subject within the scope of civil government not withdrawn from its authority may be acted upon by that body. *People* v. *Salomon,* 51 Ill. 37; *Sawyer* v. *City of Alton,* 3 Scam. 127; *Field* v. *People,* 2 id. 79; *Ruggles* v. *People,* 91 Ill. 256; *Richards* v. *Raymond,* 92 id. 612; *Harris* v. *Board of Supervisors,* 105 id. 445; *Firemen's Benevolent Assn.* v. *Lounsbury,* 21 id. 510; *Porter* v. *Rockford, Rock Island and East*

*St. Louis Railroad Co.* 76 id. 561; *Munn* v. *People*, 69 id. 80. Our first inquiry here, therefore, must be, is the General Assembly *prohibited* by our present constitution from authorizing the formation of sanitary districts, disregarding pre-existing municipal corporations, and investing the corporate authorities thereof with powers of general taxation within such districts, for the purposes for which such districts are authorized to be formed. The rule is, language restricting the legislative power of the General Assembly must be construed strictly, (*People ex rel.* v. *Wilson*, 15 Ill. 392,) and unless it shall then clearly appear that the legislation in question is within the terms of the restriction, it must be sustained. If it be doubtful, only, whether it is or not, the doubt must go in favor of the validity of the action of the General Assembly. *Home Ins. Co.* v. *Swigert*, 104 Ill. 653; *Knickerbocker* v. *People*, 102 id. 218; *Wolff* v. *Aldrich*, 124 id. 591; *People* v. *Marshall*, 1 Gilm. 672.

It is not contended that there is any express denial, in the constitution, of power in the General Assembly to authorize the formation of sanitary districts, but the contention is, that it is denied by necessary implication. Upon an examination of the constitution, it will be seen that article 10 of that instrument provides for the organization of counties, and for county government, and that in other articles it is contemplated that there will be local governments for public purposes, designated as "cities," "towns," "villages," "school districts," and "other muncipal corporations;" but there is no specification of the powers that shall be conferred upon either, and no prohibition of the withdrawal of powers once conferred upon one, and thereafter conferring them upon another. In these respects the present constitution does not differ from the constitutions of 1818 and 1848.

In *Shaw* v. *Dennis*, 5 Gilm. 405, and *Dennis* v. *Maynard*, 15 Ill. 477, which presented questions arising upon a statute enacted under the constitution of 1818, it was held that it was competent for the General Assembly to arbitrarily create a

district for the purpose of building and repairing a bridge, and to impose taxes therefor upon persons and property within the district. The constitution of 1848, however, contained this provision (sec. 5, art. 9): "The corporate authorities of counties, townships, school districts, cities, towns and villages may be vested with power to assess and collect taxes for corporate purposes, such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same." And it was held, under this section, that no other corporate authorities than those of counties, townships, school districts, cities, towns and villages could be vested with powers to assess and collect taxes for corporate purposes. (Harward v. St. Clair Drainage Co. 51 Ill. 130; People ex rel. v. Mayor, id. 17.) And this upon the ground that the enumeration of certain corporations is the exclusion of all not enumerated. But no case has been found in which it was ruled, that had this enumeration been omitted, other municipal corporations than those enumerated could not have been vested with power to assess and collect taxes for corporate purposes. On the contrary, the omnipotence of the General Assembly in all matters relating to the authorization of the formation of municipal corporations, and investing them with powers of local government, except in so far as prohibited by the constitution, has been often asserted. Thus, in People ex rel. v. Salomon, supra, the constitutionality of a statute authorizing the formation of a district for park purposes by the union of two or more towns, pursuant to an affirmative vote of the electors of such towns, respectively, and investing commissioners named in the act as its corporate authorities, with powers of taxation, was sustained, and it was, among other things, said in the opinion: "There is no prohibition which we have been able to discover, and we have been pointed to none, against the creation by the legislature of every conceivable description of corporate authorities, and when created, to endow them with all the faculties and attributes of other pre-existing corporate authorities."

And again: "The constitution nowhere commits corporate objects or purposes irrevocably to authorities now existing, nor does it prohibit the committal of them to such corporate authorities as may be called into life by the same law which creates the subject and commits it to their jurisdiction."

Since a park district does not fall within the definition of a county, a township, a school district, a city, a town or a village, it is plain the park commissioners, as such, merely, were not the corporate authorities of such a corporation as, under section 5, article 9, *supra*, could levy a tax for corporate purposes, and the act therefore sought to make them corporate authorities of each of the townships united in the park district, for park purposes. But it was held in *Harward's case*, and in the *Mayor case*, *supra*, that by the phrase "corporate authorities," within the meaning of section 5, article 9, *supra*, must be understood those municipal officers who are either directly elected by the population sought to be taxed by them, or appointed in some mode to which they have given their assent, and so it was necessary, in order to sustain the authority of the commissioners, in the *Salomon case*, that each of the townships united in the park district should vote in favor of the act, and such affirmative vote having been given, it was held that the park commissioners were thereby made the corporate authorities, for park purposes, of each of the townships united in the park district, and so were empowered to assess and collect taxes in each of such townships, for park purposes. And upon this, the court said: "These relators are made a body politic and corporate, with perpetual succession, and with a seal, and though appointed by the Governor, they are a corporate authority, within the meaning of the constitution, as the people of the towns named have consented by their votes to the mode of appointment. By their votes they have, by large majorities, adopted this act, thus making the relators, or commissioners, corporate authorities, *pro hac vice*, for the purposes of this park, and have consented to the creation of this debt. We lay no

stress upon the fact that the commissioners are, nominally, a corporation, for we do not hold it is in that capacity they can issue bonds or levy taxes to bind the people of these three towns, but as township or corporate authorities, whose appointment has been assented to by the people within their jurisdiction." To like effect, see, also, *Dunham* v. *People ex rel.* 96 Ill. 331.

In *Greeley et al.* v. *People,* 60 Ill. 191, neither a city nor a village, nor a collection of houses intermediate between a city and a village, but a district of country including, perhaps, one or more villages and an extended area of farming country, was incorporated as a town, and vested with extensive functions of municipal government, including those of levying and collecting taxes, and making and collecting special assessments for local improvements. It was objected to an application for judgment for taxes, special assessments, etc., that the constitution of 1848, by requiring the legislature to pass a general law for township organization, forbade, by implication, the granting to towns of special charters; but it was answered, that there was nothing in the constitution of 1848 prohibiting the General Assembly from granting special municipal charters, and it was added: "In the absence of prohibition, this power clearly belonged to that body, and it could exercise it as well in regard to a town six miles square as to a village with a less territory."

In *People* v. *Harper et al.* 91 Ill. 357, we held that it was competent for the General Assembly to withdraw from the corporate authorities of the city of Chicago the inspection of grain, and to devolve it upon the Board of Railroad and Warehouse Commissioners.

Public corporations for the opening, improving and repairing of roads and the building and maintaining of bridges have been created under enactments of the General Assembly, and invested with powers of taxation for corporate purposes, and it has been held that no provision of the present constitution, or

of that of 1848, requires that their boundaries shall be the same as that of the townships. (*Butz et al.* v. *Kerr,* 123 Ill. 659.) So, also, it has been held, that the General Assembly, in exercising its general power,—under the amendment to the constitution, to be hereinafter noticed, to authorize the organization of drainage districts,—is not limited by the boundaries of pre-existing corporations, nor compelled to adopt their corporate authorities. (*Owners of Lands* v. *People,* 113 id. 304.) It has likewise been held, that the burdens of opening, improving and repairing highways, building and maintaining bridges, and the care and support of paupers, may be imposed upon certain classes of municipal corporations, and afterwards changed and imposed upon others, within the discretion of the General Assembly. (*Springfield* v. *Power,* 25 Ill. 187 ; *Board of Supervisors* v. *Springfield,* 63 id. 66 ; *Logan County* v. *Lincoln,* 81 id. 156 ; *Seagraves* v. *City of Alton,* 13 id. 366 ; *Town of Fox* v. *Town of Kendall,* 97 id. 72 ; *People ex rel.* v. *Supervisors of Will County,* 110 id. 511.) And, in general, in the absence of constitutional restraint, it has been held that the General Assembly may create, annul and change municipal corporations, and control and dispose of their property as to it shall seem most in consonance with the public welfare. *People ex rel.* v. *Wren,* 4 Scam. 269 ; *Rock Island County* v. *Sage,* 88 id. 582 ; *County of Richland* v. *County of Lawrence,* 12 id. 1 ; *Trustees, etc.* v. *Tatman,* 13 id. 27 ; *Supervisors* v. *People ex rel.* 110 id. 511 ; *Harris* v. *Board of Supervisors,* 105 id. 145 ; *Wetherell* v. *Devine,* 116 id. 631.

Our present constitution, adopted in 1870, contains the following section:

Sec. 9, (art. 9.) "The General Assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes ; but such taxes shall

be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

This, it will be observed, differs materially from section 5, article 9, of the constitution of 1848, in two respects: First, it enumerates the corporate authorities of "cities, towns and villages," and provides that they may be vested with power to make local improvements by special assessment, or by special taxation of contiguous property, or otherwise; and second, it does not enumerate, as does section 5 of article 9 of the constitution of 1848, the municipal corporations, the corporate authorities of which may be vested with power to assess and collect taxes for corporate purposes, but simply provides that for certain corporate purposes "*all municipal corporations* may be vested with authority to assess and collect taxes," etc. Very clearly, the words "municipal corporations," are here used, not in their primary sense of "cities, towns and villages," but in their ordinarily accepted and more enlarged sense of public local corporations exercising some governmental function, for had it been intended to mean by them only cities, towns and villages, there would have been no difference between the language employed in the first clause to describe the corporations intended by it, and the language employed in the second clause to describe the corporations intended by that clause. This change in phraseology is conclusive that, in respect to the corporations to be affected, a different idea is intended to be expressed in the second clause than that expressed in the first clause. And the fact that the language employed is, in form, in the first clause, specific, and, in the second clause, generic, admits of no other conclusion than that it is intended the second clause shall be more comprehensive than the first clause, and include other corporations not therein enumerated, and so, necessarily, all public local corporations exercising some governmental function, which is the present popular and ordinarily accepted meaning of the words "municipal corporation." Instead, therefore, of the General Assembly being, under the

present constitution, restricted as to the municipal corporations which it may invest with power to assess and collect taxes for municipal purposes, as it was under the constitution of 1848, it is entirely unrestricted, and the General Assembly may now as readily create such corporations as it was held that it could under the constitution of 1818, in *Shaw* v. *Dennis* and *Dennis* v. *Maynard, supra,* although it can not, because of restrictions imposed by virtue of the second clause of section 9, article 9, *supra,* arbitrarily impose taxation on such corporations, as it was held in those cases that, under the constitution of 1818, the General Assembly might.

It seems to have been thought, in argument, that there is some restriction upon the General Assembly as to the boundary lines within which new municipal corporations may be authorized to be organized. This has no foundation in the constitution. There are there certain restrictions as to the boundary lines of counties, but none as respects other municipal corporations. It is probable that the idea had its origin in a misapprehension of the *Salomon case, supra.* There, as has been seen, the new corporation could only be sustained by making its corporate authorities the corporate authorities of the several townships united, for the purpose of taxation for park purposes. But now there being no restriction as to the municipal corporations that may be vested with authority to levy and collect taxes for corporate purposes, it is wholly unnecessary that the corporate authorities of the new corporation shall be also the corporate authorities of some specified pre-existing corporation, and it is not pretended that the corporate authorities of this sanitary district are the corporate authorities of any pre-existing corporation.

The preservation of health is one of the paramount objects of government. 1 Blackstone's Com. (Sharswood's ed.) 132, *133. It belongs to the police power, "subject to the proper exercise of which," says Dillon, (Mun. Corp. sec. 93,) "either by the State legislature directly, or by public corporations to

30—133 ILL.

which the legislature may delegate it, every citizen holds his property." It includes the making of sewers and drains for the removal of garbage and filth, the boring of artesian wells and the construction of aqueducts for the purpose of procuring a supply of pure, fresh water, the drain of malarious swamps, and the erection of levees to prevent overflow. See Dillon on Mun. Corp. secs. 93-96; Cooley on Taxation, (1st ed.) 101.

It is too plain for argument, that the drain here in contemplation falls within this power, and perhaps no one will question the competency of the General Assembly to invest cities, towns and villages with the power to construct like drains. But is the duty or the power of the General Assembly, in this respect, any less in regard to a rural than to an urban population? The constitution will be searched in vain for a provision or a clause recognizing the duty and the power in the General Assembly in the one case, and denying it in the other. If the General Assembly may vest the power in cities, towns and villages, and may also create a corporation in the county and invest it with the power, it would seem to inevitably follow that it may create a corporation including both city and county, and invest it with the power. It must be evident that often, to render the exercise of such power by cities effective, it would have to be exercised over large rural districts adjacent to cities, as in case of large malarious swamps lying within the vicinity of cities, and in other instances, where the air and water to be used by the city population would be poisoned and laden with germs of disease by causes existing beyond the city limits. In such cases the preservation of health in the city would require that municipal authority should be exercised beyond the city limits; and it would violate no principle of constitutional law to create a district, and invest it with powers of taxation for sanitary purposes, co-extensive with the territory to be controlled. If districts may be thus organized, the question of the propriety of their organization in this or any other particular instance belongs to the General Assembly, and not to

the courts, and it has been repeatedly held in other States, that they may be thus organized. *Reeves* v. *Treasurer of Wood County*, 8 Ohio St. 332 ; *Thompson* v. *Treasurer of Wood County*, 11 id. 338 ; *Anderson* v. *Kern's Drain Co.* 14 Ind. 199 ; *O'Reilly* v. *Kankakee Drain Co.* 32 id. 169 ; *Sessions* v. *Crunkilton*, 20 Ohio St. 349 ; *Woodruff* v. *Fisher*, 17 Barb. 224 ; *Hartwell* v. *Armstrong*, 19 id. 166 ; *Drainage Co. cases*, 11 La. Ann. 338 ; *Dean* v. *Davis*, 51 Cal. 406 ; *Donnelly* v. *Decker et al.* 58 Wis. 461 ; *State ex rel. etc.* v. *Stewart*, 74 id. 620. Cooley, in his work on Taxation, says : "Sanitary regulations are indispensable in large towns, but they may be made for every locality." P. 101, (1st ed.)

But the contention of counsel concedes, that all that we have thus far said may be admitted to be true, yet our constitution provides, in section 31, article 4, that "the General Assembly may pass laws permitting the owners of lands to construct drains, ditches and levees, for agricultural, sanitary or mining purposes, across the lands of others, and provide for the organization of drainage districts, and vest the corporate authorities thereof with power to construct and maintain levees, drains and ditches, and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this State, by special assessment upon the property benefited thereby." And this, it is contended, is a denial of power in the General Assembly to authorize the construction and keeping in repair of drains, ditches and levees otherwise than by special assessment upon the property benefited thereby, and so necessarily of the power to authorize the same to be done by general taxation on the property in the district. In our opinion, this is untenable. In construing this section, we must keep in view the other sections of the constitution relating to municipal taxation in force prior to its adoption, and the fact that its manifest purpose and effect are only a modification and amendment of those sections.

In *City of Chicago* v. *Larned*, 34 Ill. 202, followed by *Ottawa* v. *Spencer*, 40 id. 211, and *City of Chicago* v. *Baer*, 41 id. 306, it was held that an assessment on real estate, for the improvement of a street, based on frontage, could not be sustained under the constitution of 1848; that if the authority for an enactment to that effect was claimed under the right of eminent domain, it was inadmissible because it did not require compensation to be made, in benefits or otherwise, equal to the amount of the assessment; but if it was claimed under the right of taxation, then it was inadmissible because in contravention of section 5, article 9, of that instrument, in that it was not uniform upon persons and property within the jurisdiction of the body making the assessment.

It is manifest from the phraseology of the first clause of section 9, article 9, of our present constitution, that it was adopted to remove restrictions on the power of the General Assembly held to exist under section 5, article 9, of the constitution of 1848, in the *Larned case*, and in the other like cases referred to, and to enable the General Assembly to authorize the making of local improvements in the way it was there held it was prohibited from doing. But in *Updike* v. *Wright*, 81 Ill. 49, it was held that this first clause of section 9, article 9, is a prohibition against special assessments by the corporate authorities of other municipalities than those of cities, towns and villages; and the contention of counsel for appellant is, that by the same rule of construction it is also a prohibition against the making of local improvements by the corporate authorities of any other municipalities than those of cities, towns and villages, by general taxation; that the words, "or otherwise," at the end of the first clause of the section, mean "by general taxation," and that the clause therefore should be construed as reading, the "corporate authorities of no municipal corporation but cities, towns and villages shall be allowed to make local improvements by special assessment, by special taxation of contiguous property, or by general taxation."

It would be a sufficient answer to this to say, that it is not shown, by anything in the record before us, that the improvement here contemplated is a "local improvement," within the meaning of those words as used in this clause. In a general sense, all improvements within a municipality are local,—that is, they do not extend to all parts of the State; they have a locality; are nearer to some persons and property than to others. But it is evident that is not what is here meant by "local improvements," for if it were, it would have been more natural and lucid to have said "improvements," without other qualification, or, simply, "municipal improvements." We are to give all the words employed some meaning, if we can, and so we must consider "local improvements" in connection with "special assessment," for the local improvement contemplated is one that can be made by special assessment, if only the corporate authorities shall elect to make it in that way. The words "special assessment" had received a construction by this court in *Larned's case*, and in other like cases, under the constitution of 1848; and at the time of the adoption of the present constitution it was held, and has been since held, to mean an assessment to pay for an improvement for public purposes upon real property which is, by reason of the locality of the improvement, specially benefited, beyond the benefits by the improvement to real property, generally, throughout the municipality, proportioned by such benefits. (*Guild* v. *Chicago*, 82 Ill. 472; *City of Sterling* v. *Galt et al.* 117 id. 11.) But all improvements within a municipality are not, by reason of their locality, a special benefit to some real property beyond their benefits to real property generally throughout the municipality, but many times the result is directly the reverse,—that of a positive injury, in the loss of values. In such cases, it is clear the improvement could not be made by special assessment, and it is not to be presumed that a constitution would contain the absurdity of prohibiting the doing of an impossibility, as, for instance, that the General Assembly should not authorize

any but the corporate authorities of cities, towns and villages to make local improvements by special assessment, when such improvements are of that character that they can not be made by special assessment.

That this is the correct view, is further confirmed by the fact that in numerous cases decided by this court, under statutes enacted since the adoption of the present constitution, the right to levy and collect general taxes by park commissioners for park purposes, by highway commissioners for road and bridge purposes, and by school directors for the building of school houses, has passed unchallenged, and been tacitly recognized by us to be within constitutional authority. And it can surely need no argument to prove that such corporations are of precisely the same class or grade as are sanitary districts. We must hold the words "local improvements," in this connection, to mean improvements that can be made by special assessment.

Whether, in a given case, an improvement is of that character that it can be made by special assessment, is a question of fact, and not of law. It is quite probable that the relation of benefits and cost of improvement to particular property would be very different in the case of a great drain intended to benefit an extended area of city and country by affording outlets for a vast number of sewers, and also an outlet for the stagnant waters of river and lake, than it would be in the construction of an ordinary sewer benefiting only contiguous property holders by carrying off the sewage flowing from their property.

We can not take notice, as a matter of law, that the drain here contemplated is a "local improvement," within the contemplation of the first clause of section 9, article 9, of the constitution, so that it can be made by a "special assessment," and there is no allegation to that effect in the bill.

But we need not rest the decision of the question on this ground. It is a familiar rule of construction that when gen-

eral words follow particular words, the former can mean only things or persons of the same kind or class as those which are particularly mentioned. (Sedgwick on Stat. and Const. Law, 236; *Drake et al.* v. *Phillips,* 40 Ill. 388; *Brush* v. *Lemma,* 77 id. 498.) And so here, the words "or otherwise," in this clause, which are general, must mean, "or otherwise assessing the cost of the improvement against the property actually or presumptively benefited thereby,"—that being the kind or class of assessments particularly mentioned.

But, again, there could have been but two purposes in adopting this clause,—one to remove the restriction held in the *Larned case,* and other like cases, to be imposed upon the General Assembly by section 5 of article 9 of the constitution of 1848, (and, of course, by like language in the present constitution, unless qualified by other language,) preventing it from authorizing local improvements to be made at the expense of contiguous real estate on the basis of frontage; and the other, as held in *Updike* v. *Wright, supra,* to restrain the power of the General Assembly, and limit it to conferring authority upon cities, towns and villages, only, to make local improvements in the manner provided by this clause. If the words "or otherwise" include general taxation, they include every possible way in which local improvements can be made, except by special assessment and special taxation of contiguous property, and so to hold that it was intended that no municipal corporation except cities, towns and villages shall be authorized by the General Assembly to make local improvements by special assessment, by special taxation of contiguous property, or by general taxation, as contended by counsel, is but to hold that it was intended no municipal corporation, except cities, town and villages, shall be authorized to make local improvements. That this could not have been intended, we think is obvious, for several reasons. In the first place, if it had been, that would have been said. In the next place, special assessments were not condemned in the *Larned case,* and other

like cases, under the constitution of 1848, and so, even if this clause had not been inserted, would have been admissible under the present constitution. The words "by special assessment" could not, therefore, have been used to prevent any restriction that would otherwise have existed under the present constitution; but they express a mode of making a local improvement in contradistinction to that by general taxation, and so must have been used, in connection with the words "or by special taxation of contiguous property," to limit the local improvements which cities, towns and villages, only, could make to those modes, and hence, by the same rule of construction applied in *Updike* v. *Wright,*—namely, that the express mention of one thing is the exclusion of another, (Smith's Com. on Stat. and Const. Law, sec. 508,)—while municipal corporations other than cities, towns and villages shall not be authorized to make local improvements by special assessment, or by special taxation of "contiguous property," they may be authorized to make them by general taxation.

In this view, it is most probable that the words "or otherwise" were used to exclude the possibility of misapprehension that because only cities, towns and villages could be authorized to make local improvements "by special assessment," "or by special taxation of contiguous property," they could not be authorized to make them by general taxation. The prohibition is not against cities, towns and villages, for the effect of the first clause is to remove all restrictions upon the General Assembly in empowering them to make local improvements, but it is against the other municipal corporations. This, however, is solely by virtue of the clause requiring taxation to be uniform in respect to persons and property within the jurisdiction of the body imposing the same, and can extend no farther.

The words "for other corporate purposes," in the second clause, can not be held to mean, "for other corporate purposes than those of local improvement," as contended by counsel for appellant, but must mean, "for other corporate purposes than

those of local improvement by special assessment, or by special taxation of contiguous property," for it is the *manner* of making a local improvement, and not the *fact* of making it, that is the subject of the first clause. The section is plainly intended to cover the entire field of taxation,—the first clause, that of making local improvements by a mode different from that by general taxation, in which the cost of the improvements is assessed against the property actually or presumptively benefited thereby; and the second clause, that of general taxation, in which the rule of uniformity as to persons and property taxed shall be observed,—and so we held in *Murphy* v. *People*, 120 Ill. 242. In the natural order of statement, the first clause of section 9, article 9, should have succeeded the second clause, but this can make no difference if we shall only keep in mind that the first clause is in fact but a removal of restrictions, which, but for it, would be imposed by the other provisions.

In the light of our previous decisions, we must read so much of section 9, article 9, as is pertinent to the present question, regarded as a prohibition, as it has been held to be, upon the General Assembly, as follows: First, the General Assembly shall not authorize taxes to be imposed by the corporate authorities of municipal corporations otherwise than uniformly upon persons and property within the jurisdiction of the body imposing the same, except in cases of local improvements by cities, towns and villages; second, no municipal corporation other than cities, towns and villages shall be authorized to make local improvements by special assessment, by special taxation of contiguous property, or by otherwise assessing the cost of the improvement against the property actually or presumptively benefited thereby.

Section 31 of article 4, as it now reads, was submitted by the General Assembly of 1877 to the vote of the people at the November election of 1878, and it was adopted by a majority vote at that election. Strictly speaking, only the first clause of the section is an amendment of section 31 of article 4 of

the constitution, which provided that "the General Assembly may pass laws permitting the owners or occupants of lands to construct drains and ditches, for agricultural and sanitary purposes, across the lands of others." That and the next preceding section, which relates to "private ways," were obviously originally adopted because of the ruling in *Nesbitt* v. *Trumbo*, 39 Ill. 110, and *Crear* v. *Crowley*, 40 id. 175, holding that one person could not acquire an easement in the land of another without his consent, because that would be depriving the person from whom the easement was obtained, of his property otherwise than pursuant to the law of the land, and hence in violation of section 8, article 13, of the constitution of 1848. The balance of the section was adopted to invest the General Assembly with power to authorize the formation of drainage districts, and invest their corporate authorities with power to make drains, levees, etc., and keep them in repair, by special assessment, which, in *Updike* v. *Wright, supra,* it was held that it did not possess under the then existing provisions of the constitution, and it operated, therefore, as an amendment, in fact, of that section also. (*Blake* v. *People,* 109 Ill. 505; *Owners of Lands* v. *People,* 113 id. 306.) We must, therefore, now read section 9, article 9, as thus amended, and, so reading it, its language must be thus:

"The General Assembly may vest the corporate authorities of cities, towns, villages and *drainage districts* with power to make local improvements by special assessment. The General Assembly may vest the corporate authorities of cities, towns and villages with power to also make local improvements by special taxation of contiguous property. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such taxes shall be uniform in respect to persons and property within the jurisdiction of the body imposing the same."

This, and this only, is the extent of this amendment to the constitution, so far as it has a bearing upon any question

arising upon this record. Before its adoption, drainage districts could not be invested with power to make local improvements by special assessment,—only cities, towns and villages could be invested with such power. Since its adoption, drainage districts, as well as cities, towns and villages, can make local improvements by special assessment. But cities, towns and villages can also make local improvements by special taxation of contiguous property, which drainage districts can not do. The effect of the amendment is the same as a grant of power to the General Assembly, in that it enables the General Assembly to now do what, by reason of previous constitutional restrictions, it could not before do; but it is not, in fact, a grant, but the simple removal of the previous constitutional restrictions, enabling the General Assembly to exercise original powers, which it was, by those restrictions, prohibited from exercising.

The rule of construction that the constitution is not to be regarded as a grant of legislative powers to the General Assembly, but merely as a restriction upon its powers, being kept in view, the first clause of section 9, article 9, as amended, only amounts to this: First, the General Assembly shall not vest the corporate authorities of municipal corporations, other than cities, towns, villages and *drainage districts*, with power to make local improvements by special assessment; second, the General Assembly shall not vest the corporate authorities of municipal corporations, other than cities, towns and villages, with power to make local improvements by special taxation of contiguous property, etc. And so the power to authorize the formation of sanitary districts, and to invest their corporate authorities with power to levy and collect general taxes for corporate purposes, is entirely unaffected by this amendment.

It may be that the General Assembly is prohibited from authorizing the formation of drainage districts for agricultural or mining purposes, and investing their corporate authorities

with power to make improvements otherwise than by special assessment, because such purposes are, as intimated in *Hessler* v. *Drainage Comrs.* 53 Ill. 105, and *Houston* v. *Board of Directors,* 71 id. 313, private, and not municipal; but as to this we express no opinion, for it can not affect the present case, since, as we have seen, sanitary purposes are, beyond all question, legitimate objects of municipal government.

*Second*—The language of section 12, article 9, of the constitution, is: "No county, city, township, school district or other municipal corporation shall be allowed to become indebted, in any manner or for any purpose, to an amount, including existing indebtedness, exceeding, in the aggregate, five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes previous to the incurring of such indebtedness." It would be difficult to employ language making it plainer that the prohibition is on each corporation singly, and not upon two or more in the aggregate.

The boundaries of this sanitary district are not co-terminous with those of the city of Chicago, or of any other municipality, nor are the persons and property within its limits the same, or substantially the same, as those within the limits of the city of Chicago or of any other municipality. The district was organized, pursuant to an affirmative vote of the electors within its limits, as a municipal corporation for sanitary purposes, entirely distinct from and independent of the government of the city of Chicago, and of that of every other municipal corporation, and it has municipal authorities of its own, elected by the electors within the district, pursuant to the requirements of its charter, whose functions are in nowise connected with any other municipal government. The case is therefore wholly unlike *Dunham* v. *People,* 96 Ill. 331, where it was held the park district was for the city of Chicago. This corporation is as independent of every other municipal corporation as is a township under township organization, and the case is there-

fore analogous to *Wabash, St. Louis and Pacific Ry. Co.* v. *McCleave*, 108 Ill. 368, where it was held that a like objection was untenable.

But it is said that if new corporations may be created and vested with some of the functions of local government of pre-existing municipal corporations, this section of the constitution may be rendered a dead letter by the mere multiplication of municipal corporations. It will be quite time enough to meet that question when it shall arise. A case presenting the question of the power of the General Assembly to authorize the re-distribution of the powers of an existing city, town or village to a number of corporations equal to the number of the powers distributed, for the purpose of getting rid of restrictions upon the old corporation, is so essentially and palpably different from the present case that it would be entirely irrelevant to stop to consider it.

The present legislation may be unwise—improvident—even vicious; but it does not follow that it is unconstitutional. Under the most perfect constitution there must be much discretion in the legislative department, for an abuse of which there can be no remedy in the courts. This legislation preserves, to the fullest extent, the principles of local self-government. The law is not forced upon an unwilling community. The mode of fixing the limits of the district is, it is true, arbitrary; but this is inevitable in the organization of any new municipality. Before there can be any government, some power must arbitrarily determine where its boundaries shall be, for otherwise it can not be known who are to take part in organizing, electing, etc., and so there can be, here, no valid objection in that respect. So far as it is possible, in any case, for the inhabitants of a district to select for themselves a municipal government, this municipal government has been selected by the people of this district. As we have before seen, we can only condemn legislation for unconstitutionality where some provision of the constitution can be pointed to as

plainly and palpably violated. It is not enough that the principle of some particular restriction would, if extended, prohibit the legislation. The prohibition of a thing, by name, in the constitution, is equivalent to an admission of what is not named. *Prettyman* v. *Supervisors, etc.* 19 Ill. 411.

Since, therefore, we have been unable to find any denial, expressed or implied, in the constitution, of power in the General Assembly to authorize the formation of sanitary districts, as provided in this act, we must hold that the clause of the constitution in question applies to this district precisely as it does to any other independent municipal corporation, and that therefore the indebtedness of other municipalities can not be taken into consideration in determining the limit to which it may incur indebtedness.

*Third*—The only prohibition against the formation of municipal corporations by local or special legislation is in section 22, article 4, of the constitution. "Sanitary districts," or "drainage districts for sanitary purposes," are not enumerated in that section. The municipal corporations expressly mentioned are only "cities, towns and villages," and the rule hereinbefore alluded to, that the expression of one is the exclusion of another, is applicable. (Smith's Com. on Stat. and Const. Law, *ubi supra; Prettyman* v. *Supervisors of Tazewell County et al. supra.*) We held in *Owners of Lands* v. *People*, 113 Ill. 296, that a drainage district was not within the prohibition of this section, and, on principle, that must be conclusive here.

The general clause in the same section, that when a general law can be made applicable, no special law shall be enacted, has been repeatedly held to be addressed to the General Assembly, and not the subject of review by the courts. *Johnson* v. *Joliet and Chicago Railroad Co.* 23 Ill. 202 ; *People* v. *Harper*, 91 id. 37 ; *Owners of Lands* v. *People, supra.*

We find no sufficient reason for disturbing the decree below, and it is therefore affirmed.

*Decree affirmed.*

Mr. JUSTICE MAGRUDER, dissenting:

I am unable to concur in the view that this Act is a constitutional law for the reasons stated hereinafter and in the dissenting opinion in *People* v. *Nelson,* (page 602, *post.*)

The provisions of the Act, which authorize money to be raised for the improvements therein specified by *general taxation,* are unconstitutional.

As is stated in the dissenting opinion in the Nelson case, the districts formed under this Act must be regarded as drainage districts. Although there are expressions in the Act in regard to the carrying off and discharge of sewage, yet such sewage is alleged to be a part of the drainage contemplated by the Act, and is spoken of in section 7 as being included in the drainage which the board of trustees are to provide for. It is true that one of the objects of drainage is to carry off the surplus waters from lands, but carrying off the water, together with the filth mixed with the water, from the sewers of a city, and from the various connections by means of pipes or otherwise with such sewers, and conducting it into a common outlet, channel or receptacle, is also a species of drainage. The language of the second clause of section 31 of article 4 of the constitution is broad enough to include drains for carrying off the sewerage of cities as well as drains for the surface water of farming lands. (*Village of Hyde Park* v. *Spencer,* 118 Ill. 446). *The only mode specified in the constitution for the construction of drains through the instrumentality of drainage districts is by special assessments, and not by general taxation.* Said section 31 is as follows: "The General Assembly may pass laws permitting the owners of lands to construct drains, ditches and levees for agricultural, sanitary or mining purposes, across the lands of others; and provide for the organization of drainage districts and vest the corporate authorities thereof with power to construct and maintain levees, drains and ditches, and to keep in repair all drains, ditches and levees heretofore constructed under the laws of this State, *by special assessments* upon the

property benefited thereby." The first clause of this section was in the original constitution as adopted in 1870, but the second clause beginning with the words "and provide for the organization," etc., was adopted by the people as an amendment to the constitution in November, 1878. Why was the constitution amended in this particular?

The power of the legislature when not exercised in violation of the principles of justice and free government and in opposition to the common sense of mankind, is omnipotent, except so far as it is limited by the State and Federal Constitutions. Our State constitution is not a grant of power to the legislature, but a limitation upon the power of the legislature. As, therefore, a necessity existed in 1878 for a constitutional provision providing for the organization of drainage districts with power to construct drains by special assessments, there must have been some limitation upon the power of the legislature in this regard in the constitution as it already existed. It is conceded that such limitation is to be found in section 9 of article 9, which reads as follows: "The General Assembly may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of contiguous property or otherwise. For all other corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes; but such taxes shall be uniform in respect to persons and property, within the jurisdiction of the body imposing the same."

What is the obvious meaning of section 9? It is a limitation upon the power of the legislature to grant to any municipal corporations, except cities, towns and villages, the authority to make local improvements. Cities, towns and villages are the only municipalities, whose corporate authorities can be vested by the legislature under this section with the power to make local improvements by special assessments, or by special taxation of contiguous property, *or otherwise.* The words "or otherwise" are very broad and include general taxation. Cities,

towns and villages can be vested with the power to make local improvements by general taxation, as well as by special assessment or special taxation. (*City of Galesburg* v. *Searles et al.* 114 Ill. 217).

"For all *other* purposes," that is, for all purposes other than making local improvements, all municipal corporations may be vested with authority to assess and collect taxes, the same to be uniform, etc. The plain meaning of section 9, as it stood before the amendment of 1878, may be thus expressed: All municipal corporations, including cities, towns and villages, may be vested by the legislature with power to assess and collect taxes (the same being uniform in respect to persons and property within the jurisdiction of the body imposing the same) *for all corporate purposes except making local improvements*, but, as to local improvements, the legislature is prohibited from granting the power to make such improvements to any other municipalities than cities, towns and villages, which may be clothed with the authority to make them either by special assessment, or special taxation, or general taxation.

It is, therefore, clear that, under the limitations contained in section 9, the legislature had no power to clothe a municipality organized as a drainage district, whether for sanitary, or agricultural, or mining purposes, with authority to construct channels or drains or ditches by any of the methods named in section 9, because such a district was not a city or a town or a village. Hence, the amendment of 1878 was adopted for the purpose of giving to such districts the power needed to make such improvements as were necessary for drainage purposes.

Counsel for appellees contend, that the legislature already had the power, under the second sentence of section 9, to create drainage districts and vest them with the power to make improvements by taxation, and that the sole object of the amendment of 1878 was to give them the power to make such

improvements by the additional method of special assessment. I cannot concur in this view.

In the first place, if the legislature already had the power to create drainage districts and authorize their corporate authorities to make improvements by one method, towit: general taxation, it is hardly to be supposed that such method would not have been adopted without going through the process of securing a constitutional amendment for the purpose of accomplishing the same object by another and different method, towit: special assessments. In the second place, the amendment of 1878, by authorizing the legislature to vest the corporate authorities of drainage districts with the power to make improvements by special assessments, thereby limited and restricted the legislature to special assessments as the only method of making such improvements which the districts in question could be authorized to resort to. *Expressio unius exclusio alterius.* It is not denied that the first sentence of section 9, by authorizing the legislature to vest the corporate authorities of cities, towns and villages with power to make local improvements, thereby withheld from the legislature the authority to vest the corporate authorities of any other municipalities with such power. Why should not the same principle of construction apply to the amendment of 1878? If, by mentioning cities, towns and villages alone, other municipal corporations were excluded, why, by mentioning special assessments alone, are not other methods excluded?

In the third place, the legislature by the first sentence of section 9, could confer upon cities, towns and villages the power to make local improvements by special assessments, or special taxation, or general taxation, but the amendment of 1878 is silent as to special taxation and as to general taxation, and mentions only special assessments. It will not be contended that the amendment conferred upon the legislature the authority to vest drainage districts with the power to make improvements by special taxation of contiguous property. For

the same reason, by its silence as to general taxation, it did not authorize such districts to be vested with the power to make improvements by that method. In other words, the amendment being a modification of the limitation contained in the first sentence of section 9, the modification will not be held to be broader than the language warrants. The amendment gives to drainage districts, as well as to cities, towns and villages, the power to make certain improvements, but, if it had intended that such districts should have the right to adopt more than one of the methods for making such improvements which cities, towns and villages already possessed, its language would not have been confined to one only of such methods.

Finally, the contention, that the legislature had the power to authorize such districts as are provided for in this Act to raise money by general taxation, proceeds upon the theory that the improvements contemplated by the Act are not local improvements. It has already been said that the words, "for all other purposes," in the second sentence of section 9, mean all other purposes except the making of local improvements. If, therefore, the improvements contemplated by the Act are local improvements, they are not embraced among the "corporate purposes" for which alone, by the terms of the second sentence, municipal corporations may be vested with authority to "assess and collect taxes." But it is quite clear, that the improvements, which drainage districts are organized to construct, cannot be regarded otherwise than as local improvements.

The very fact that the drains mentioned in the amendment of 1878 are to be constructed "by special assessment upon the property benefited thereby," shows that the framers of that amendment regarded the improvements to be made by drainage districts as local improvements. No improvement other than a local improvement is ever made by special assessment. A special assessment involves the idea that the property assessed receives a special benefit from the improvement, and such property cannot be assessed for more than the amount

of the benefit it so receives.    Cooley, in his work on Taxation, (2d ed. page 606,) says: "Special assessments * * * are made upon the assumption that a portion of the community is to be specially and peculiarly benefited in the enhancement of the value of property, peculiarly situated as regards a contemplated expenditure of public funds." "A local assessment can only be levied on land; * * * it is an assessment on the thing supposed to be benefited. * * * A local assessment is levied on property situated in a district created for the express purpose of the levy and possessing no other function, or even existence, than to be the thing on which the levy is made." (Id. page 607.) "To warrant the levy of local assessments, there must not only exist in the case the ordinary elements of taxation, but the object must also be one productive of special local benefits." (Id. page 622.) In *Owners of Lands* v. *The People ex rel.* 113 Ill. 296, in speaking of the power conferred by and exercised under said section 9, we said: "it was never supposed, in such cases, that the proposed improvement must, to be valid, be territorially coextensive with the municipal authority under which it is made. Such a requirement would, of necessity, render nugatory the power to make special assessments, *because they can only be local* and where there are special benefits."

The very act now under consideration authorizes the levying of special assessments.    After section 10 has provided for the collection of a direct annual tax to pay the interest and principal of an authorized loan of $15,000,000.00, and after section 12 has provided that the board of trustees may levy and collect taxes "for corporate purposes" upon property within the district to the amount, in one year, of one half of one per cent. of the value of the taxable property within the corporate limits, etc., then section 13 proceeds as follows:   "The board of trustees shall have power to defray the expenses of any improvement made by it in the execution of the powers hereby granted to such incorporation, by special assessment, or by general

taxation, or partly by special assessment and partly by general taxation as they shall by ordinance prescribe. It shall constitute no objection to any special assessment that the improvement for which the same is levied is partly outside the limits of such incorporation, but no special assessment shall be made upon property situated outside of such sanitary district, and *in no case shall any property be assessed more than it will be benefited by the improvement for which the assessment is made.*"

If the improvements proposed to be made by the districts organized under this Act are not local improvements, then upon what ground can those portions of the Act, which authorize the levying of special assessments, be sustained? An improvement may be none the less local because indirectly the public at large receive a benefit from it. The lots fronting on a street are specially assessed for the paving of the street, although thousands of citizens, who do not live on the street, are benefited in a certain sense by the use of it after it is paved. Cooley in his work on Constitutional Limitations (5th ed. page 617) says: "Assessments for the opening, making, improving, or repairing of streets, the *draining* of swamps, and the like *local* works, have been generally made upon property with some reference to the supposed benefits which the property would receive therefrom."

It is true, that oftentimes an improvement partly local in its character and partly of general benefit, may be made partly by general taxation and partly by special assessment. "In the case of sewers it is very common to provide that the cost shall in part be a general levy on the municipality, and in part be collected by special assessment." (Cooley on Tax. page 619.) But this species of double or two-fold taxation must be imposed by cities, towns and villages. Upon them alone is such power conferred by the constitution.

The only source from which it is claimed in this case that these sanitary districts can derive the power to raise money by

general taxation is the second sentence of section 9. But that sentence not only excludes improvements that are wholly local, but improvements also that may be partly local and partly general. The Act of 1889 evidently, by the language used in section 13 as above quoted, treats the improvements to be made under it as local in that they confer a special benefit upon particular property, and general as being of benefit to the public at large. Therefore such improvements are excluded from those "other corporate purposes" named in the second sentence of section 9. The making of an improvement partly general and partly local still has in it the elements of a local undertaking.

If the contention of counsel, that the districts provided for in this Act are not drainage districts, is sound, then all the provisions of the Act in regard to special assessments, and the issuance of bonds payable out of the funds to be realized from such assessments, must fall to the ground as being unconstitutional. This must be so, because the districts in question not being cities, towns or villages, cannot make local improvements under section 9 of article 9, and, not being drainage districts, cannot make such improvements under section 31 of article 4. Under the limitations imposed by these two sections, only cities, towns, villages and drainage districts can be authorized by the legislature to adopt the method of special assessments for the purpose of making local improvements.

But I think that the improvements contemplated by this act are local improvements, and, therefore, if they can be made at all under the Act, they must be made by special assessment and not by general taxation. It follows that all the provisions of the Act for raising money by general taxation, are unconstitutional and void.

Inasmuch, therefore, as these districts can only raise money by special assessment and not by general taxation, it follows that the indebtedness of $15,000,000.00 mentioned in section 9 of the Act cannot be contracted. The constitutional limita-

tion of municipal indebtedness to five per centum of the value of the taxable property in the municipality, etc., is accompanied by the constitutional requirement, that, at the time of incurring such indebtedness, provision must be made for the collection of a direct annual tax to pay the interest and principal. The creation of the debt and the provision for the collection of the tax must go together. Hence, if the power to provide for the collection of the tax does not exist, the power to contract the debt is also wanting.

The mode of submitting the question of the organization of the districts to an election by the people is not in accordance with the interpretation heretofore given by this Court to the requirements of the constitution upon this subject.

The authorities relied upon by counsel for appellees, as justifying the creation of sanitary districts in the mode prescribed by the Act, are the cases known as the *Park* cases, the most important of which are *The People* v. *Salomon*, 51 Ill. 37; *People* v. *Brislin*, 80 id. 423; *Dunham* v. *The People*, 96 id. 331; *The People* v. *Morgan*, 90 id. 558; *The People* v. *City of Chicago*, 51 id. 58; *Cornell* v. *The People*, 107 id. 372.

A careful examination of these cases will show, that the power to assess and collect taxes for corporate purposes, which the legislature was authorized by section 5 of article 9 of the constitution of 1848 to vest in the corporate authorities of towns, was held to have been lawfully vested in the Park commissioners, because the Park district was formed by a union of two or more towns, and its commissioners could be regarded as corporate authorities of such towns. That this is so, will appear from the following language in *Dunham* v. *The People*, *supra:* "It will thus be seen that before the adoption of the constitution of 1870, construction had been given to this clause of the constitution of 1848 by this Court, by which it was held that the district embracing the three towns of South Chicago, Hyde Park and Lake, when formed into a district for the purposes provided for in that Act, *was to be regarded as a town*, or

rather that the Park commissioners, for these purposes, were to be regarded as *the corporate authorities of the three towns.*"

An examination of the Park cases will also show, that the Park Act was submitted, not to the votes of the people in the Park district, but to the votes of the people of the *three towns,* and that the Act was adopted by a majority of the votes cast *in each town.* Thus, in *The People* v. *Salomon, supra,* it was said: "It is further objected, that the fact, that a majority of the votes of the three towns has been given to this Act, imparts to it no additional vitality, for by the scheme of the Act it might be that one of the townships by its large vote could dominate over the other two, and thus subject the minority towns to an onerous burthen imposed without their consent. This might be so, and if so, the case would be like the case of Lincoln Park, in which we held it contrary to the plain behests of the constitution to impose a local burthen of such magnitude upon an unwilling people without first obtaining the consent of the people to its imposition. When a similar case shall arise, the decision will doubtless be the same, but the facts admitted by the pleadings show *a majority of the votes of each of the towns* was cast in favor of the act."

A study of the Act of 1889, in the light of the features of the Park decisions as thus noted, will present an entirely different view of that Act from the one heretofore taken. The territory, which may be incorporated as a sanitary district under section 1 of the Act, must contain two or more incorporated cities, towns or villages, and no territory can be included in the district, which is not situated within the limits of a city, incorporated town or village, "or within three miles thereof." By the use of the latter words the district may be so formed as to contain territory outside of a city, town or village. All the districts organized under the Act cannot therefore be regarded as formed by the union of two or more cities, towns or villages, as the Park district was formed by the union of two or more towns. Hence, it cannot be said, as to a district containing

such outside territory, that it may be clothed with the same power to make local improvements, which a single city, town or village may exercise under section 9 of article 9 of the constitution. It would differ from the Park districts mentioned in the cases cited, because, unlike the latter, it would not be an aggregation of one or more of the municipalities specifically named in the organic law.

But the words, "or within three miles thereof," are in the alternative, and the Act contemplates the formation of districts, whose territory would lie wholly within two or more cities, towns or villages. Could the organization of such districts be sustained upon the principles laid down in the Park cases? I think not.

By the terms of section 1, the purpose of organizing the sanitary district is "the maintenance of a common outlet for the drainage *thereof*." The word "thereof" refers to the "area of contiguous territory within a single county," and, when such area is wholly within the limits of two or more cities, towns or villages, the drainage referred to is that already existing in such cities, towns or villages. I do not wish to be understood as controverting the doctrine that the legislature of a State has a right to control the municipalities of its own creation. The legislature may even dispose of the property of such municipalities when their corporate powers are repealed, and, in certain cases, where those powers are modified. (Cooley on Cons. Lim. 5th Ed. page 292.) But the purpose of this Act, as to the class of districts now under consideration, is not to establish a new system of drainage, but to maintain an outlet for drainage already established. The drainage, for which the outlet is to be maintained, is that which is already under the control of the cities, towns or villages in the district. This is apparent from the use of the word "sewage" in section 7, which has already been referred to. Sewerage is a system of drainage by means of sewers, and sewage is sometimes used to denote the water flowing in or carried off by sewers, and

sometimes the system of sewers for carrying off filth or super-
fluous water. Sewerage, or drainage by sewers, exists only,
as a general thing, in cities or incorporated towns or villages.

It follows that the Act, in proposing to furnish a common
outlet for the sewage of the incorporated municipalities within
its limits, deals directly with such municipalities. It recog-
nizes their existence, and does not seek to curtail their powers,
except in the one matter of a common outlet for their sewage.
The sewers in a city belong to the city; they are built with
money raised by taxation from the property of the residents
in the city. It would seem to be necessary that some action
should be taken by the authorities of the city before a connec-
tion could be made between its sewers and the common outlet
to be built by the district. The trustees of the district, in-
stead of providing drains for the lands of individual owners,
provide a common drain for the existing drains of municipal
corporations.

That the districts in question propose to deal with the mu-
nicipalities within their borders is shown by the language of
section 26. That section assumes to state the terms and con-
ditions, upon which one city, village or incorporated town,
"which owns a system of water-works and supplies water from
a lake or other source which will be saved and preserved from
sewage pollution, by the construction of the main channel,
drain, ditch or outlet herein provided for, and the turning of
the sewage of such city and district therein," shall be required
to furnish water from its water-works to another city, town or
village situated in the same district with it.

In view of the relations which must thus exist between the
sanitary district and the cities, towns or villages within its
borders, the Act should have provided that "the question of
the organization and establishment of the proposed sanitary
district" should be submitted to the votes of each of such
cities, towns and villages and should be adopted by a majority
of the legal voters in each. It does not so provide. It directs

that the question be submitted to the voters of the proposed district, or of the district determined upon by the commissioners. The result of such a course must be that, where one of the cities, towns or villages in a district contains a large population, and another of them contains a small population, the latter may be forced to come into the district, and to connect its system of sewerage with the common outlet, by the votes of its more powerful neighbor, and without the consent of its corporate authorities or of a majority of its legal voters. One of the cities, towns or villages by its large vote could dominate over the others.

Such a result was condemned in the Park cases. If, in those cases, it was necessary that the Park Act should secure the majority of the legal votes in each town before the Park commissioners could be regarded as the corporate authorities of the three towns, so, here, a majority of the legal voters in each city, town or village should vote in favor of organization under the Act of 1889, before the trustees of a sanitary district can be regarded as the corporate authorities of the cities, towns or villages in such district. It might happen that one of such cities, towns or villages had a system of sewerage connecting with another and different outlet from that proposed to be constructed by the sanitary trustees. Shall it be compelled to go to the expense of severing its connection with the old outlet and forming a juncture with the new one without the consent of its inhabitants or its corporate authorities? Shall its property or that of its citizens be taxed to maintain an outlet which it may not use, and which a majority of its people may be opposed to using? (*The People ex rel.* v. *Mayor, etc. of Chicago,* 51 Ill. 18).

· The question does not depend upon the largeness or smallness of the vote in any particular instance of an attempt to organize a district under the Act. The point is that the Act itself does not upon its face provide for an election in each of the towns, cities or villages within the proposed district. It

is therefore invalid under the rule laid down in the Salomon case, where it appears that section 18 of the Park Act required the election to be held in the towns.

This Act is unconstitutional because, under its provisions, either or all of the incorporated cities, towns or villages situated within any district organized under it, may contract a greater indebtedness than that allowed by the organic law. If the question does not arise upon the face of the Act itself, it arises upon the pleadings in one or more of the cases now before us. The bill in the *Wilson* case avers that, before the organization of the Chicago Drainage District of which the city of Chicago is a part, that city had reached the constitutional limit of indebtedness, and such averment is admitted by the demurrer.

Section 12 of article 9 of the constitution reads as follows: "No county, city, township, school district or other municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount including existing indebtedness in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness. Any county, city, school district, or other municipal corporation, incurring any indebtedness as aforesaid, shall before, or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same. This section shall not be construed to prevent any county, city, township, school district or other municipal corporation from issuing their bonds in compliance with any vote of the people, which may have been had prior to the adoption of this Constitution, in pursuance of any law providing therefor."

By the prohibition that no municipal corporation "shall be *allowed* to become indebted," the constitution imposed a re-

striction upon the legislature as well as upon the municipal corporation itself. (*Law* v. *The People*, 87 Ill. 385). The General Assembly cannot pass a law permitting such a corporation to become indebted beyond the specified limit. But it is said that there is nothing in the constitution which prohibits the legislature from creating municipal corporations; that it can create a new municipal corporation embracing territory which includes several municipal corporations already existing; that this new corporation can become indebted to the amount of five per centum on the taxable value of the property within its limits; that the debt thus created is the debt of such new corporation and not of each of the old corporations, and may be incurred although each of such old corporations has already reached the constitutional limit of indebtedness.

The power of the legislature to create a new municipal corporation is subject to the limitations contained in the constitution, and, among others, to that contained in section 12 above quoted. The purpose of that section is "to effectually protect persons residing in municipalities from the abuse of their credit and the consequent oppression of burthensome if not ruinous taxation." (*Law* v. *The People*, *supra*). "A city is made up of individuals owning the property within its limits, the lots and blocks which compose it, and the structures which adorn them." (*The People* v. *Mayor,* etc. 51 Ill. 18). Section 12 provides that when the indebtedness is incurred, a direct tax must be provided for to pay it. A direct tax is one that is "assessed upon the property, person, business, income, etc., of those who are to pay" it. (Cooley on Taxation, 2d ed. page 6). The property of each tax-payer is liable to be taxed to the extent of five per centum of its assessed value when the constitutional limit is reached by the municipal corporation.— If that corporation can be united with others, and a new district can be formed by the union, with power to assess another tax of five per cent on the value of the taxable property, then each tax payer is made liable for ten per cent of the assessed

value of his property, instead of five per cent thereof. It makes no difference, that the bonds representing the indebtedness are called the bonds of a sanitary district rather than those of a city within the sanitary district. The additional indebtedness rests, after all, upon the same property and upon the same individuals.

No vote of the people can override the constitutional prohibition. Taxation cannot be imposed by the corporate authorities of a municipal corporation without the consent of the tax-payers, but it cannot be imposed beyond the constitutional limit with such consent. The last sentence of section 12, by permitting the issuance of bonds in compliance with a vote of the people taken prior to the adoption of the constitution, impliedly negatives their issuance in pursuance of any vote had after such adoption, except within the prescribed limits. It has already been seen that the vote for the organization of the sanitary district must be by the people of each city, town or village in the district. That the voters of each of such cities, towns or villages cannot confer upon the corporate authorities thereof the power to assess and collect taxes for the payment of a greater indebtedness to be incurred by such city, town or village than the five per centum already named, will not be denied. This being so, can such voters confer upon the authorities of the sanitary district the authority to levy and collect taxes for an indebtedness to be incurred by the district beyond the five per cent. limit already reached by the cities, towns or villages? I think not. It is a mere evasion of the constitution. If a city, having contracted debts to the full amount of the five per cent., can become still further indebted by uniting itself with one or more adjoining towns or villages, or with a small strip of territory near its borders, then the restriction imposed by the constitution becomes a meaningless farce.

It is true that a *county* may become indebted to the amount of five per centum on the value of the taxable property therein, although there may be municipal corporations, such as cities,

towns or villages, within its borders, which have respectively reached the constitutional limit of indebtedness, but this is true, because the constitution permits counties to so become indebted by expressly mentioning them. Such permission, however, cannot be extended to taxing districts improperly called municipal corporations, which were not in existence when the constitution was adopted, but created since its adoption.

The Park cases arose under a provision in the constitution of 1848. That instrument did not contain the limitation on municipal indebtedness now under consideration. Hence, the question did not arise in those cases as to the amount of debt which the Park district might incur.

It seems to be conceded by counsel on both sides that the Act of 1889 was passed with special reference to the organization of a sanitary district of which the city of Chicago should be a part. It is proposed to double the indebtedness, to which the tax payers of that city are already subject, by adding its territory to that of the incorporated town of Cicero and the incorporated village of Lyons and certain lands in the township of Lyons, and calling the whole the "Sanitary District of Chicago," with power to borrow $15,000,000.00, to levy special assessments upon property to an indefinite amount and issue bonds drawn against such assessments. This district is to construct a vast improvement, the most of which lies at the distance of many miles outside of its own limits. It is to be made liable to suits for damages in overflowing lands, in polluting the waters of rivers, to injunction suits and suits for specific performance. It is to pay the expenses of commissioners appointed by the Governor to inspect its work. It is to devote a part of the revenues, to be derived from the docks to be constructed by it, to the support of the State Government to the relief of the balance of the State. The Act shows upon its face that its framers regarded the improvement for which it provides as an uncertain experiment. No other construction can be placed upon the cautious phraseology made use of as

to the dangers of overflow and of river-pollution. All this risk is to be run, and all this expense is to be incurred, by a district framed upon the theory, that the legislature can authorize an aggregation of municipalities to do what the constitution of the State forbids a single municipality to do. If the city of Chicago cannot lawfully increase its indebtedness through the action of its own authorities and through the machiney of its own government, it cannot do so through an alliance with the town of Cicero and the village of Lyons. The designation of the alliance as a Sanitary district cannot hide the ruinous infraction of a wise and wholesome provision of the constitution.